Statement of the Case.
MONROE, C. J.
This is a suit to confirm a tax title.
The land in dispute was owned, under recorded title, by E. W. Shirk and assessed in his name for the year 1909. He failed to pay the taxes when due, and it was offered for sale therefor, and on May 28, 1910, was adjudicated do the state. The deed to the state was recorded on June 27, 1910, and on June 23, 1911, the land was redeemed by Shirk, who on April . 28, 1913, sold it to the defendant Blacksher, whose title was recorded on the same day and who appears to have gone into immediate actual possession, and was in possession when, on December 2, 1913, this suit was instituted.
The litigation arises out of the following circumstances;
On February 4, 1907, one Krotz appears to have caused to be recorded in the conveyance office of the parish of St. Landry two instruments, the one purporting to be a copy of a copy of a contract between him and Shirk, and, the other, his ex parte declaration concerning that contract and other matters. They read as follows, to wit:
“This contract, made this 7th day of July, 1905, between Albert Walker Shirk and G. W. Krotz, witnesseth:
“That said Shirk agrees to sell * * * to said Krotz, on or before 90 days from date, all land owned by him in St. Landry parish, south of Bayou Petite Prairie, amounting to not more than 10,000 acres and not less than 8,000 acres, on the terms set down below. Said Krotz has paid on said purchase, which is to be $5.25 per acre, $2,000 cash, and, upon payment of an additional amount, in cash, within 90 days, equal to one-third the purchase price, said Shirk agrees to make deed of even date with this agreement, granting title to same, and accept for payment of the remaining amount, two notes, each for one-third of the purchase price, bearing 6 per cent, interest from date of transfer, said interest payable annually and said notes to be made for the term of one and two years, respectively. Said $2,000, paid in cash, is to apply on the first, or cash, payment of one-third. If, at the expiration of said 90 days, said Krotz should be unable to make the remainder of the cash payment of one-third, said Shirk agrees to grant an additional 90 days, for the closing of the deal and the completion of the cash payment, on the payment of an additional $2,000 cash, which $2,000 shall apply, with the first $2,000, paid in cash, on the cash payment of the purchase price of the property. If, at the end of said 90 days’ period, said Krotz shall fail to make balance of cash payment, the $4,000, paid in cash, shall be forfeited to said Shirk and said Krotz shall have no claim against the property.”
The foregoing purports to bear the signatures of Shirk and Krotz.
The other instrument reads:
“The following declaration hereto attached is made part of this contract:
“Declaration to specify description of properties sold by E. W. Shirk to C. W. Krotz and from C. W. Krotz to Melville Land Company. Be it known that, on this, 1st day of February, .1907, personally appeared before me, notary public in and for the parish of Orleans, C. W. Krotz, who declares that the following described lands, situated in the parish of St. Landry, are part of the lands described in the contract of said E. W. Shirk and C. W. Krotz, made on the 7th day of July, 1905, and described in said contract as being all of the lands owned by E. W. Shirk in St. Landry parish, * * * *613 south of Bayou Petite Prairie, amounting to not more than 10,000 acres and not less than ' 8,000 acres, which contract is hereto attached and made part hereof, the original being on record in clerk’s office, St. Landry parish, La.; . that the lands hereinafter described are "a- part1 of said lands included in said contract and being lands reserved by said Krotz from a sale made by said Krotz on the 7th day of October ■ 1905, to F. W. Oreelman of a part of the lands' covered by the Shirk contract.
“That, at the time or about thirty days after the sale to said Frank W. Oreelman, under contract, an agreement was made between- said-P. W. Oreelman, E. W. Shirk and O. W. Krotz whereby it was agreed that said Krotz.should retain all of the lands herein described, and that the said P. W, Oreelman should retain .the balance of said lands and settle with said E. W. Shirk for any balance of such land, and that it was agreed between said E. W. Shirk and O. W. Krotz that the lands herein described were the property of O. W. Krotz, arid tha't he, the said E. W. Shirk, would execute and deliver a deed to said O. W. Krotz or assigns for the land herein described and would take a vendor’s lien back on the property for hny balance that might be due from Krotz to Shirk on the lands described in this declaration. It was understood and agreed between E. W. Shirk. P. W. Oreelman and O. W. Krotz that $4,000, cash, paid to E. W. Shirk on contract between B. W. Shirk and C. W. Krotz, made on the 7th day of July, 1905, should apply on the lands herein described and owned by said Krotz. and that, some time prior to the first day of November, 1905, the said O. W. Krotz paid to B. W. Shirk on the land herein described, $5,500, as additional payments on the lands herein described, which lands are the Same lands included in the contract between Krotz and Shirk and described as land owned by said Shirk south of Bayou Petite Prairie. The legal description of the property so reserved by said Krotz out of the lands sold to said Krotz by Shirk, under contract of July 7, 1905, is as follows.”
Then follows a description of the lands (or, perhaps, part of them) which are involved in this controversy, and the declaration concludes as follows:
“All the conditions of the contract between Shirk and Krotz have been fully complied by said Krotz and have heretofore been sold (sic.) and conveyed to the Melville Land Company, the original contract between E. W. Shirk and C. W. Krotz is on record in Conveyance Book in St. Landry Parish in Louisiana.”
Appended to the above declaration is what purports to he an acknowledgment by Krotz, before a notary in New Orleans, after which is a certificate, by the deputy clerk of the court, in St. Landry, which reads:
“I hereby certify that the within and foregoing is a true and correct copy of a copy of act No. 60,055, of date February 1, 1905, and duly recorded, February 4,1907, in Conveyance Book” etc.
If there is anything in the record, beyond the “copy of a copy,” thus recorded at the instance of Krotz, to show that Shirk and he ever entered into any contract, or, assuming the contract to have been entered into, that he ever complied with its conditions and became the owner of the land here in dispute, it has escaped our observation.
On January 26, 1907, Krotz, a resident of Defiance, Ohio, and the Melville Box & Lumber Company, said to be incorporated under the laws of Delaware, and represented by Krotz, as president, executed an act of sale of the land in dispute to “The Melville Land .Company” (of which Krotz was also president, but) which is said to have been represented in the transaction by William Helmick, the recited consideration being $7,000 cash. The act contains the following recital:
. “All of which lands were part of lands included in a sale to C. W. Krotz by written contract, dated October 14, 1905, between E. W. Shirk and said C. W. Krotz. The land conveyed in the deed was reserved by said C. W. Krotz in the sale of lands, part of which were included in the Shirk contract, by said C. IV. Krotz to P. W. Creelman, and, by an agreement between P. W. Creelman, E. W. Shirk ■and C. W. Krotz, the land above described was set apart and reserved by said Krotz and $7,000 was paid to said E. W. Shirk by the Melville Box & Lumber Company and C. W. Krotz, as part of the consideration of the purchase price of said land, to said Shirk, * * * said money having been furnished by said Melville Box & Lumber Company and contract transferred at that time by C. W. Krotz to the Melville ’Box & Lumber Company, which certified copy of said contract is hereto attached and made a part hereto.”
Following the foregoing instrument, as copied in the transcript, we find this by the clerk of the court, to wit:
“Note. — The contract referred to as attached to and made part of the foregoing act is not *615 thereto appended, although clamp marks indicate that a document was formerly attached thereto. The contract appears to be the same as hereinafter offered by the plaintiffs, recorded February 4, 1907” — being the copy of the copy of the contract, with declaration attached, hereinabove copied in this opinion.
On January 20, 1908, the Melville Land Company, appearing by Krotz as president, made a sale of a good many tracts of land to the Melville Box & Lumber Company, represented by William Helmick as secretary; and on January 28, 1908, the Melville Land Company, represented by Krotz, president, the Melville Box & Lumber Company, similarly represented, and the Melville & Krotz Springs Land Company, represented by Krotz as vice president, entered into a contract whereby various tracts were conveyed by the two companies first named to the company last named. It seems to us a little doubtful whether any of the land involved in this case was included in the transactions thus mentioned, but they indicate that Krotz was the representative of those companies in their land transactions in this state, if, indeed, he was not the real party in interest, operating in their names.
However that may be, the land here in dispute appears to have been assessed for the year 1909 (and prior to that) in the name of the Melville Land Company; but, it was also assessed for that year as the property of E. W. Shirk, and, the tax not having been paid, it was offered for sale on May 28, 1910, under both assessments upon which occasion Krotz and Godchaux (of Godchaux & Haas) were present in order to see that it was bid in for Krotz’s benefit, the understanding being that Godchaux was to do the bidding. Shirk’s representative, Lawler, was also on the spot, and the offering under the land company assessment having been first in order (as it happened), Lawler gave public notice — to the tax collector and to the Krotz party — that the land was doubly assessed, and that the assessment to the land company was unauthorized and illegal. The property was nevertheless adjudicated to Godchaux & Haas, but they did not then pay the cash, as required by law, nor did they pay it until, say,. June 10th; the tax collector having assumed to allow the payment to go over, as a matter of convenience, to that time. Later in the day he offered the property under the assessment to Shirk, and, receiving no bid, he adjudicated it to the state, and the deed to the state was executed and recorded on June 27th, whilst the deed to Godchaux & Haas was not executed or recorded until July 8th following. On September 12, 1911, Godchaux & Haas executed an act purporting to convey the property, or the major portion of it, to H. R. Thompson, who is shown to have been a friend and associate of Krotz. Being asked whether Krotz objected to the transfer, Godchaux was unable to answer that he did, and explained his failure to make the transfer to Krotz by saying that he wanted his money. On October 20, 1913, Thompson appears to have conveyed to the plaintiffs herein his “undivided one-fourth interest” in the property in question, and they are said to have acquired another undivided one-fourth interest from the (Melville) Krotz Springs Land Company. What became of the remaining interest acquired by Thompson, we are unable to say. In the meanwhile, on June 23, 1911, Shirk had redeemed the land by paying the tax of 1909 with interest and penalties into the state treasury, and had received the certificate of redemption and cancellation, and on April 28, 1913, he sold the portion here in dispute to the defendant Blacksher, who, as we have stated, took immediate actual possession, fenced in 600 acres, and was in possession when this suit was brought in Decefnber, 1913. It may be here noted that, though the Melville Lumber Company is made a defendant herein, it has put in no appearance, the explanation being that the *617 question of its interest, or apparent interest, had already been settled in a previous proceeding; so that the only real defendant before the court is Blacksher.
Opinion.
[1] It is too clear to admit of discussion that Krotz could not devest Shirk’s title,’ and acquire the land himself, by his ex parte declaration, whether verbal or written, recorded or unrecorded; nor do his counsel think that he could. But it is argued-that, though he had no title, and though .plaintiffs claim under him, they have acquired a good' title by reason of the various recorded' transfers, from Krotz, and through thg ..various, corporations and individuals for whom he was acting, or who were acting for him, ,or whose names he was using; and, -njor.e. .particularly, by the tax sale under the assessment in the name of one of them. .There are several reasons, however, why.’.that view, cannot be sustained. Pretermitting the tax sale, it is clear that no title could .be’ derived from Krotz since he had no title. .Concerning the tax sale, it is clear that it was made under an assessment which was -not in the name of the owner, for taxes for which the owner was also assessed. It is said an’ assessment in the name of the. registered owner is not an illegal assessment; that the-law so declares; that the Melville Land Company was as much a registered owner as was Shirk; and that, the firs,t "adjudication having been made under the assessment to that company, the claim of the state was satisfied and the power of the collector exhausted.
The law contemplates that property shall be assessed in the name of the owner, if practicable; but, as the assessor has, ordinarily, no facilities for inquiring behind the title, which the owner may allow to" remain upon the record, it provides that an assessment in the name appearing upon the record shall be sufficient, and it further provides that, if the assessment be made in the name of one not the owner, it shall not be a good ground for annulling the sale for the tax, unless the owner makes his complaint within a specified time. To that rule, established by the Constitution, there are, however, certain exceptions, also established by the Constitution, and one of them is the case óf dual assessment, in .which case the Constitution holds open the door to the real owner of property, which has been assessed in his name, to contest the validity of •a sale under an assessment for the same tax, made in the name of one not the owner.
It declares that:
“No sale of property for taxes shall be set aside for any cause, except on proof of dual assessment, or of payment of the taxes for which the property was sold, prior to the date of the ’sale, unless the proceeding to annul is instituted within six months from service of notice of sale, which notice shall not be served until the time of redemption has expired, or * * * within three years from the date of recordation of the tax deed, as to sales made hereafter, if no notice be given.” Const, art. 233.
The statute which governs in this case declares:
“That, if the land to be assessed be a tract or a lot known by name, or, if the owner’s name be known, it shall be designated by those particulars.” Act 170 of 1898, § 8, p. 351.
“In making all assessments it shall be the duty of the assessor to describe all property according to such a description as will reasonably identify the property assessed and to assess the same in the name of the owner, except in the case of unknown owners.” Id. § 19, p. 357.
“Any assessment made in the name of a party, deceased, shall be good and valid throughout the state, unless notification in writing of the death, and whether or not the succession has been opened, and when and where, shall have been made in due season to the assessor by the heirs or parties interested. And in all cases property assessed in the name of the owner as appears on the record of the mortgage or conveyance office at the date of the listing shall be deemed properly assessed.” Id. § 25, p. 360.
“That, for the purposes of taxation and tax sales, it shall be sufficient to assess and advertise all property in the name of the * * * persons, whether dead or alive, who at .the time the assessment was made, appeared to be the *619 owners thereof upon the books of the conveyance * * * or of the recorder’s office; * * * but all property may be assessed in the name of the real owner,” etc. Id. § 53, p. 372.
“The sale will be without appraisement, for cash, in legal tender money of the United States.” Id.
It is quite evident from the foregoing that it is the intention of the lawmaker that all assessments shall be made in the name of the real owner of the property to be taxed, but that, in the absence of better information as to the ownership, the assessor is authorized to assume that the person whose name so appears upon the public records is the real owner, and that, in such case, the assessment in that name will be sufficient; but it would be a reflection upon the intelligence of the lawmaker to hold that there is anything in the provisions quoted, or elsewhere in the law, which conveys the idea that, where there are two assessments upon the same property, for the same tax, each in a name appearing upon the public records as the owner, both are to be sustained as valid assessments, the one as good as the other, and that the first adjudication of the property, no matter under which assessment, satisfies the claims of the state and exhausts the power of the collector. The law authorizes one assessment, as the basis of legal taxation, and not two, and, where there are two assessments, the one or the other is necessarily illegal, and'hence furnishes no basis for a legal sale of the property; and no more authoritative recognition of that principle could be found than the provision of the Constitution, whereby the limit of time prescribed by that instrument, within which tax sales may be set aside, is removed (or withheld) in cases of dual assessments. If; however, the real owner, whose property has been the subject of dual assessment, is to be met, when he attacks a sale made under an assessment in the name of a stranger, with the ruling that the sale is valid because the stranger had caused his name to be inscribed upon the public records as the owner, and the assessment, constituting the basis of such sale, had been made in that name, as well as in the name of the real owner, the constitutional exception in favor of the real owner would amount to nothing, or something worse than nothing — a delusion and a snare.
The fact that, in other cases, the real owner may be precluded, by his failure to act within the limit of time prescribed by the Constitution, from attacking a sale of his property which has been made under an assessment in the name of another, or in no name, has no bearing upon this case.
Our conclusion, upon the point under consideration, then, is that an assessment in the name of one, not the real owner of the property assessed, though so appearing upon the public records, is not “sufficient,” within the meaning of the law, when brought into conflict with an assessment of the same property, for the same tax, in the name of the real owner, who also appears in that character on the public records.
[2, 3] As to the argument that the state, having sold the property under an illegal assessment, and received the proceeds of the sale, thereby satisfied its claims, and that the collector thereby exhausted his authority, the answer is that the collector and the adjudicatee having been notified, in advance, that the assessment under which it was proposed to make the first adjudication was one of two assessments for the same tax, and was illegal, were placed on inquiry, and, the fact being that it was illegal, the sale predicated thereon was unauthorized and illegal, and the bidding in of the property by the adjudicatee was done at his own risk. What may be the rights of the adjudicatee, or of those who claim under him, in respect to the money paid to the collector, is a matter in which the defendant is not concerned. In that connection, however, it may be remarked that the law confers .upon the tax collector the power to sell “for cash,” only; and, as he has no au *621 thority to extend the time within which the cash is to be paid, the adjudication does not become effective unless, and until, the- condition requiring the cash payment has been complied with. In the instant case,, the adjudication was made to Godchaux oh' May 2Sth, but, by reason of an understanding between him and the tax collector, he did nót make the payment until June 10th, and the-collector’s deed was not recorded until July 8th following, whereas the deed to -the st^t.e was recorded on June 27th; from which it ¡follows that, when, on the afternoon of May 28th; the adjudication was made tO'-the state, the adjudication, which had been made in the morning', to Godchaux, had not become effective by reason of his failure "to -comply with the condition that the price should he paid in cash, and that, the deed to the state having been recorded before the deed' to Godchaux, the title of the state took precedence, and it became the owner of the property, subject to the right of the tax debtor to redeem it within one year from the registry of- the state’s title, of which right, as we. have seen, he availed himself.
The judgment appealed from is therefore affirmed.
See dissenting opinion of PROV0STY, J., 77 South. 478.