THE BUCKEYE DEVELOPMENT CORPORATION
*v.* BROWN & SHILLING, INC. ET AL.

[No. 339, September Term, 1965.]

*Decided June 23, 1966.*

The cause was argued before HAMMOND, HORNEY, OPPEN-HEIMER, BARNES and McWILLIAMS, JJ.

*Isidor Roman,* with whom was *Robert Eugene Smith* on the brief, for the appellant.

*Harris James George,* with whom were *R. Taylor McLean* and *Royston, Mueller, Thomas & McLean* on the brief, for Brown & Shilling, Inc., and other interested parties to the sale, part of the appellees.

*Thomas B. Finan, Attorney General,* and *Thomas P. Perkins, III, Assistant Attorney General,* on the brief for the Sheriff of Baltimore County, who conducted the sale, the other appellee.

McWILLIAMS, J., delivered the opinion of the Court.

This appeal arises out of a quarrel between Brown & Shilling, Inc., an appellee (Brown), and The Buckeye Development Corporation, appellant (Buckeye). A story (long and wearisome) goes with it but, fortunately for us and those obliged to read this opinion, to dispose of it we need to deal with but a single chapter.

Brown is trying to collect from Buckeye $9,518.60 for plumbing installed in a supermarket built by Buckeye and leased to Acme Markets, Inc. Buckeye claims Brown owes it in excess of $30,000. In the course of its campaign to lay hands on its money Brown obtained a judgment (by default) against Buckeye. In December 1964 Brown caused a writ of *fieri facias* to be issued and the sheriff, obedient to his instructions, levied upon Buckeye's equity in the supermarket. The public was advised by an advertisement which appeared in the Jeffersonian (published in Baltimore County) on 5, 12, 19 and 26 February 1965 that the sheriff would sell Buckeye's equity at 12 o'clock noon on 1 March 1965 at the court house door to the *highest bidder for cash.*

At the stroke of twelve, the auctioneer employed by the sheriff read the advertisement and asked for bids. There were about a dozen people in attendance but only two bidders. The bidding began at $1,000 and soon escaladed to $15,000. Stewart A. McLean thereupon bid $15,250. McLean, president of The McLean Land Company, Incorporated, and the brother of counsel for Brown (R. Taylor McLean, Esq.), was acting, in this instance, for Homewood Holding Corporation. He had been directed by its president, Robert G. Merrick (his brother's wife's uncle), to bid up to $15,250. McLean (S.A.) had in his pocket a certified check for that amount when he made the bid. As soon as the bidding advanced beyond $15,250 he left the scene.

The highest bidder, at $16,000, was Nachman Gerber. He is the president and (with his wife) the sole stockholder of Buckeye. Earlier in the day Gerber had gone to the sheriff's office to see about having the sale called off. He was told this would be done if he paid the amount of the judgment ($9,518.60) and the expenses. This he was not able to do because, he said, his "money was tied up." Because the auctioneer had been told of the incident, he repeated twice during the bidding that cash or a certified check would be required of the successful bidder. Gerber said he "didn't have the money on * * * [him] but * * * [he] could get it." The sheriff and Mr. McLean (R.T.) declared this to be unsatisfactory. Gerber then spoke to Joseph L. Soley, a bystander. What Gerber said to Soley was not disclosed but Soley was heard to say that "he couldn't do it because

he couldn't make enough on his money." Gerber's attorney (Samuel S. Eisenberg, Esq.) then indicated he would offer his check for the $16,000. The sheriff refused to consider Mr. Eisenberg's check because he had "seen many lawyer's checks bounce also."

The sheriff, the auctioneer and Mr. McLean (R.T.) having decided to reoffer the property, the bidding began again. This time the property was "knocked down" to Soley (the by-stander at the first sale) for $15,750. Soley had neither cash nor certified check but he said his bankbook was in his office (a building trailer) about 1½ miles from the court house. They all (auctioneer, sheriff, Mr. McLean (R.T.) and Soley) trooped off to Soley's trailer where he exhibited a passbook showing funds on deposit in a savings and loan association. The sheriff testified "it was plenty to cover the purchase price." It was then about 1:00 P.M.

After the exposition of the passbook Soley telephoned his attorney and his partner. What they said to him the record does not make explicit but it is easy to surmise they were not happy about his purchase. After these conversations Soley announced that he would not go through with the sale unless he "got a guaranteed title." The sheriff said he didn't "say flatly no that he wouldn't" but all considered it to be the equivalent of a flat no. With the situation "still what you might say up in the air" they all (except Soley) left. They didn't go back to the court house to reoffer the property because it was then around 2:45 P.M. and, as the sheriff said, "By then [there] wouldn't have been anyone there." Nothing further was done on 1 March in respect of plans to resell the property.

By midday on 2 March Mr. McLean (R.T.) had procured his brother to accept an assignment (without consideration) from Soley of all his right, title and interest in the property. This was executed by Soley individually and as president of The Hamilton Building Company. McLean (S.A.) paid the sheriff $15,750.

On 3 March the auctioneeer reported to the sheriff that, on 1 March, he had sold the property to The Hamilton Building Company "by Joseph L. Soley, President" for $15,750, subject to a first mortgage of $334,000 (approx.), a second mortgage

of $35,000, and Acme's lease. He reported further that "Mr. Soley" has since assigned his interest to McLean Land Company. There is also in the record a document, under the masthead of the auctioneer, entitled "Contract of Sale", which states that The Hamilton Building Company "acknowledge[s] purchasing the property [for $15,750] and agrees to comply with the terms" in the advertisement of sale. Soley signed this [on 2 March] as president. At the bottom of the page, over the signature of the sheriff, are the words, "I hereby acknowledge receipt of $15,750 in full payment on [sic] the above described property as stated in terms of sale." The deed from the sheriff to The McLean Land Company was executed on 10 March. It was recorded among the Land Records of the county on 24 March. It recites a sale to The Hamilton Building Company and the receipt from it of $15,750.

On 4 March the sheriff mailed to Mr. McLean (R.T.) a check for $9,742.26 which represented the amount of the judgment, interest, costs and a deposit of $100. The forwarding letter lists $78 in advertising costs, $415 for the auctioneer and $284 levy costs, concerning which we shall have more to say later on.

Buckeye contends there are irregularities in the conduct of the sale for which it should be set aside. We agree. Other contentions are listed but our decision makes it unnecessary to consider them.

The sale of an interest in land under a writ of *fieri facias* at common law was impossible because of the inhibitions inherent in feudal tenure. An exception was provided, in Maryland and certain other colonies, by the Statute of 5 Geo. II, c. 7, which allowed the sheriff to deliver the debtor's land to the creditor under the writ of *elegit*. The present power of sheriffs to sell land under writs of *fieri facias* is derived from Chap. 160, § 1 of the Acts of 1810, now Code, Art. 83, § 1 (and virtually unchanged). Hartogensis, *Maryland Statutory Modification of the Common Law of Real Property*, 1 Md. L. Rev. 238, 244 (1937).

The distinctions between sheriff's sales and other judicial sales are too well known to require elaborate comment here. While the only reason for a sale by the sheriff under the writ

230

of *fieri facias* is to accomplish a satisfaction of the judgment, the sale should be so conducted as to promote competition and to secure the best price. Judge Raine (the trial judge) felt "the sheriff is entrusted with a certain amount of discretion" in conducting execution sales and it must be conceded that this is generally true. Nevertheless, whatever may be the limits of that "certain amount of discretion" it must be fairly and impartially exercised for the benefit of all concerned. Ordinarily the sheriff may follow the reasonable directions of the judgment creditor but he should be at all times aware that he is not merely the servant of the creditor and that the debtor may have interests which he has a duty to protect. Indeed, in some circumstances, the bidders at the sale may be drawn within the purlieus of his duty to be fair and impartial. *Home Owners Loan Corp. v. Braxtan,* 220 Ind. 587, 44 N. E. 2d 989 (1942) ; *City of St. Louis v. Peck,* 319 S. W. 2d 678 (Mo. App. 1959) ; 33 C.J.S., *Executions,* § 201 (1942) ; 21 Am. Jur., *Executions,* § 176 (1939).

There are some areas in which there is little room for the exercise of discretion. When the published terms of sale provide, as in the case at bar, for a sale "to the highest bidder for cash" the sheriff may not vary the terms of sale by accepting anything else. The term "cash", as used here, excludes checks, drafts and negotiable instruments in any other form. It means United States currency. Certified checks, bank drafts and cashier's checks may, in appropriate circumstances, constitute an exception when drawn upon or issued by banks the existence and solvency of which are well known to the sheriff. See *Kleckner v. Bank of America Nat. Trust & Savings Ass'n,* 97 Cal. App. 2d 30, 217 P. 2d 28 (1950) ; *Eastham v. Melville Land Co.,* 142 La. 610, 77 So. 475 (1918) ; *Rowe v. Granger,* 103 N. Y. S. 439 (1907) ; Annot., *Propriety of accepting check or promissory note in satisfaction of bid at execution or judicial sale had for cash,* 86 A.L.R. 2d 292 (1962) ; 2 Freeman, *Executions,* § 293 a (3rd ed. 1900) ; Rorer, *Judicial Sales,* § 729 (2nd Ed. 1878) ; 33 C.J.S., *Executions,* §§ 216-17 (1942) ; 21 Am. Jur., *Executions,* §§ 228-30 (1939). But see *First Federal Savings & Loan Ass'n of Dallas v. Sharp,* 359 S. W. 2d 902 (Texas 1962), discussed in 23 Md. L. Rev. 373 (1963).

The very concept of a sale "for cash" connotes and requires an immediacy of payment which is conspicuously absent in the case before us. What happened is almost farcical. Gerber's lack of cash (or certified check), after the property had been "knocked down" to him at the first offering, disturbed no one. They simply ignored him and started over again. For all the sheriff knew, Soley, who likewise had no cash (nor certified check), was in no better position than Gerber. Nevertheless the sheriff, the auctioneer and Mr. McLean (R.T.), deserting Gerber and any prospective bidders who might still have been on the scene, set off after Soley to see his bankbook. An hour later they left Soley's office, having seen the passbook, but without cash, check or contract. Moreover, they were acutely aware of Soley's repudiation of the sale and the depressing fact that, even if they went back to the court house to offer the property for the third time, there would be no one there to bid. Plans for the resale of the property were left in abeyance.

The comment of the court in *Kleckner* is especially pertinent:

> "It is the duty of a trustee, once it has started, to continue with reasonable dispatch with a sale under a trust deed; *the terms being cash, the trustee is not required to hold up the sale while sundry bidders leave the place to go to banks or elsewhere to get cash. Such conduct of a sale could well result in confusion, in the dispersal of bidders present, and in loss to persons represented by the trustee.*
>
> "*In execution sales it is the duty of the sheriff to require immediate payment in cash of the bid. Kelly v. Barnet,* 24 Cal. App. 119, 140 P. 605. Civil Code Section 1657 provides that if an act consists in the payment of money only it must be performed immediately upon the thing to be done being exactly ascertained. In Wiltsie, Real Property Mortgage Foreclosure, 5th Ed., 1939, Vol. 2, at page 1081, appears the following: 'But if any person other than the mortgagee becomes the purchaser, where the sale is for cash, he must comply strictly with the terms of sale, and pay the price bid in cash; a note to the party entitled to

the proceeds of the sale is not cash, and the tender of such note will not be a compliance with the terms of sale. It has also been held that the officer may refuse to receive checks.' " (Emphasis supplied.) 217 P. 2d at 31.

Mr. McLean's (R.T.) procurement of the assignment from Soley to his brother's company was probably a sensible and expeditious method of resolving the embarrassment to himself and to the sheriff caused by the abortive sale. Absent objection from Buckeye, that would have been the end of it. There is no showing that a resale would produce a greater price, although Buckeye's brief suggests the inadequacy of $15,750. And it very well may be that Buckeye's only reason for taking this appeal is to gain time to improve its obviously attenuated financial condition. Nevertheless, we do not think execution sales should be conducted in such a casual, haphazard manner and the only way to make our disapproval effective is to set the sale aside. To do otherwise, we think, would be tantamount to providing every sheriff with access to a modern Pandora's box.

It is likely that from time to time there will be situations where the immediate payment of cash would be so restrictive as to discourage bidders from attending the sale. The sheriff should have no difficulty anticipating such situations and, after consultation, where possible, with the creditor and the debtor, he should fix terms of sale calculated to attract bidders and promote competition among them. But whatever the terms they should be strictly adhered to and the sheriff should not depart from the scene until the successful bidder has provided what is required of him in this regard.

As earlier stated, the sheriff, as required by Code, Art. 83, § 3 (1957, Repl. Vol. 1965), published the advertisement in a county newspaper. It is conceded he did not notify Buckeye of its right to select the newspaper as provided by Code, Art. 83, § 7 (1957, Repl. Vol. 1965). We think, however, that under our holding in *Preissman v. Crockett,* 194 Md. 51, 69 A. 2d 797 (1949), Buckeye waived its right to demand advertisement in the paper of its selection. We doubt that the use of another county paper would have effected a different result but it is probably true, as Buckeye contends, that an additional ad-

vertisement in the Baltimore papers would have brought out more bidders since the property lies about at the boundary between the city and the county. In our judgment the better practice would be for the sheriff routinely to notify debtors of their right in this regard. Sales would be less liable to attack and, in many cases, the debtor would know better than the sheriff which newspaper would be more advantageous to him. Furthermore, it would focus the debtor's attention on the advisability of his providing additional advertising and enable him to plan accordingly.

Although Buckeye has not complained of the charges made by the sheriff, we feel obliged to comment briefly. It will be recalled that the sheriff deducted from the balance due Buckeye $284 for levy costs and $415 for the auctioneer's charge. Whatever the practice may be in the several counties, we know of no statute or decision of this Court which permits the sheriff to employ an auctioneer and charge the cost thereof to the debtor. Nor are we aware of any reason why the sheriff, or one of his deputies, cannot conduct the auction at an execution sale. We note that the Attorney General was of the same opinion in 1939. 24 *Ops. Att'y Gen.* 671 (1939). It has been held that the sheriff cannot employ an auctioneer at the expense of the debtor without his consent. *Wallis v. Shelley,* 30 F. 747 (C.C.S.D. N.Y. 1887) ; *Allar Co. v. Snodgrass,* 252 S. W. 2d 730 (Tex. 1952) ; 33 C.J.S., *Executions,* § 201 (1942). This would seem to be the proper rule to be followed. The debtor might very well conclude it would be worth the cost of employing a professional auctioneer to have the bidders stimulated to a higher pitch of enthusiasm, but it seems to us an exorbitant price to pay for a service which can be performed equally as well, in most cases, by the sheriff or one of his deputies, and especially so when the charges of the sheriff are taken into account.

Code, Art. 36, § 25 (b) (2) (1957, Repl. Vol. 1965), allows the sheriff to charge 1½% of the first $5,000, 1% of the second $5,000 and ½ of 1% of the excess over $10,000. The maximum fee is $250. Applying the rates set forth in the statute, the sheriff would appear to be entitled to $153.75. How a charge of nearly twice as much can be justified we are unable to say but counsel may wish to look into the matter if the property is resold.

Judge Raine's order dismissing Buckeye's petition will be reversed and the case will be remanded for the passage of whatever orders may be necessary to restore the parties to the status existing immediately prior to the sale. The costs will be paid by appellees.

*Order reversed.*

*Case remanded for the passage of whatever orders may be necessary to restore parties to status existing at 12:00 noon 1 March 1965.*

*Costs to be paid by appellees.*