570 A.2d 866

**John F. FOWLER, et al.**

v.

**William FITZGERALD, et al.**

**Nos. 598–600, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

March 6, 1990.

Edward H. Myer, III (Barbour, Zverina & Myer, P.A., on the brief), La Plata, for appellants.

David F. Jenny (Christy Holt Chesser, on the brief), Leonardtown, for appellees.

Argued before MOYLAN and WILNER, JJ., and JAMES S. GETTY (retired Judge, Specially Assigned).

WILNER, Judge.

The principal dispute in this case involves an issue that has plagued the Court of Appeals and its Standing Committee on Rules of Practice and Procedure for more than a decade: what, if any, limits there should be on fees paid to an auctioneer who, on behalf of a trustee or sheriff, conducts a forced sale of real property.

The underlying facts here are not in dispute. In 1987, three judgments were entered against Claude and Delores Goldsmith in the Circuit Court for St. Mary's County. One, in the amount of $51,980, was in favor of John Fowler and Fred Pumphrey; the second, in the amount of $11,250, was in favor of John and Tracy Fowler; and the third, also in the amount of $11,250, was in favor of Emmet and Virginia Potter. On November 10, 1987, the sheriff levied execution on certain real property owned by the Goldsmiths. That

property—lots 140, 141, and 142 Shenandoah Drive—was already subject to two mortgage liens.

Before any sale of the property could take place, the Goldsmiths filed a petition in bankruptcy, thereby staying further proceedings. In September, 1988, the Bankruptcy Court approved a stipulation of settlement allowing the sheriff's sale to proceed, subject to the following conditions:

(1) The judgment creditors would bid at least $105,000 for the property, including the two mortgage liens;

(2) The Goldsmiths would receive $9,309 out of the proceeds of sale as their claimed exemption of equity "after payment of or credit to purchaser for the first and second liens on the subject properties but prior to any distribution of proceeds to [the judgment creditors]";

(3) The judgment creditors would reduce their claims to $45,000, in the aggregate; and

(4) Any funds received at the sheriff's sale in excess of the two liens, the debtors' exemption, and the judgment creditors' liens in the amount of $45,000 would be paid to the bankruptcy estate.

With the bankruptcy stay lifted, the execution sale took place on November 3, 1988. Although a deputy sheriff was in attendance, in accordance with a general policy of the sheriff an auctioneer, William J. Fitzgerald, actually conducted the sale. Prior to the sale, counsel for the judgment creditors announced that the property was subject to the two mortgage liens which, at the time, had an aggregate balance of $83,768. According to the sheriff, 10 people appeared at the sale, three of whom submitted bids. The high bid was $27,000, which came from John and Tracy Fowler.

In due course, the sheriff filed his report of sale and proposed distribution. The Report of Sale showed the high bid to be "$27,000 over and above the first and second mortgages totaling $83,768.54—effective total sale price $110,768.54." The proposed distribution showed a total sales price of $110,768. From that, the sheriff deducted a Sheriff's fee of $250, an auctioneer's fee of $4,430, and advertising expenses of $88, leaving $106,000 for distribu-

tion. Pursuant to the stipulation filed in the bankruptcy proceeding, the first $83,768 would go to the two mortgage lienholders, the Goldsmiths would get the next $9,309, and the balance of $12,923 would be applied against the $45,000 claim of the judgment creditors. It is evident from these documents, and was confirmed at oral argument, that the Fowlers, as successful bidders, did not in fact assume the mortgage debt but took the property subject to it.

On December 16, 1988, John Fowler filed a petition to establish a different distribution. He proposed to show the gross sales price as $27,000, to credit against that price the $88 advertising cost, a *$210* sheriff's fee, and the $9,309 due to the Goldsmiths, and to have the balance of $17,393 credited against the judgments. Aside from a $40 difference in the sheriff's fee, the only significant difference between Fowler's proposal and the sheriff's was the auctioneer's fee, which Fowler proposed to eliminate entirely.

At a hearing held on the petition, Fowler asserted that (1) if an auctioneer's fee was proper at all, it should not come out of the funds received by the sheriff, for then the creditors rather than the debtors would be paying it, and (2) given the actual work done by the auctioneer, the fee was far too high. The evidence offered and taken at the hearing concerned the second complaint. Mr. Fitzgerald testified to the services he performed:

"Well, I stood in front of the courthouse steps. I mingled around the crowd who was there and were the serious bidders and who was not serious bidders. I proceeded to read the announcement in the local newspaper that showed the sale was going to take place, and the legal description, and the balance of the ad. And, I conducted the sale of the property on the courthouse steps."

There was no indication that Mr. Fitzgerald did any other work in connection with the sale. There is nothing to suggest that he searched out any potential bidders. He said that he spent "probably half an hour to an hour" on the matter that day. As noted, only three people entered bids.

The fee of $4,430 derived from the sheriff's policy of paying auctioneers 4% of the gross sales price received in sales of real property. That policy was established in 1987 by a sergeant in the sheriff's office, who was instructed by the sheriff to "set up a policy for auctioneers for the judicial system." The sergeant contacted three auctioneers in the county, all of whom agreed to serve as auctioneers in sheriff's sales. He recounted: "I asked them what the fee for auctioneers was, and all three agreed this was the fees they were receiving, and we accepted those fees, four percent real estate and ten percent on personal property." No one other than the three auctioneers was consulted. Effective September, 1987, the sergeant continued, the sheriff's policy was to employ an auctioneer for every sheriff's sale and to pay the agreed-upon scale. That is what the sheriff agreed to pay Mr. Fitzgerald.

Mr. Fowler offered evidence from a Michael Whitson, who described himself as a title abstractor who also worked as an auctioneer. Whitson opined that a reasonable fee for the work performed by Mr. Fitzgerald would be between $75 and $250. This was based on about 12 auctions he had conducted in St. Mary's County and on his review of courthouse records of other sales. Because Mr. Whitson had never conducted a sheriff's sale, however—his auctioneering experience being solely with foreclosure sales—the court struck his opinion testimony and ultimately entered an order ratifying the sheriff's report. The $250 sheriff's fee was approved based on a finding that the total sales price was $110,768, rather than $27,000, and the auctioneer's fee was approved based on the sheriff's practice of paying 4% of the total sales price. In this appeal, Mr. Fowler continues to challenge both fees.

### I. *Sheriff's Fee*

■ Whether the sheriff's fee should be $250 or $210 depends entirely on whether the sales price is to be regarded as $110,768 or only $27,000. Md.Cts. & Jud.Proc.Code Ann. § 7–402 sets the fees collectible by a sheriff. Subsec-

tion (a)(6) allows the following fee for the sale of real property under execution or attachment: "One and one-half percent of the first $5,000; one percent of the second $5,000; and one-half of one percent of any amount in excess of $10,000. The sheriff shall collect a minimum of $1.50 and a maximum of $250 under the provisions of this paragraph."

If the sales price upon which these percentages are based is $27,000, as contended by Fowler, the fee would indeed be $210; if the base price is $110,768, the maximum fee would be applicable.

In *Buckeye Development Corp. v. Brown & Shilling,* 243 Md. 224, 220 A.2d 922 (1966), the Court had before it a number of challenges to a sheriff's sale of real property which, like the property here, was subject to two mortgage liens. The two liens totaled about $369,000. The sheriff accepted a bid of $15,750, from which he deducted in his Report a $415 auctioneer's fee and a $284 sheriff's fee. The debtor (Buckeye) challenged the acceptance of the $15,750 bid; it did *not* complain about the two fees deducted by the sheriff. Nonetheless, though agreeing with Buckeye's position as to the acceptance of the bid and remanding for a resale, the Court chose to comment on those two fees as well, finding both inappropriate. We shall discuss the matter of the auctioneer's fee later. As to the sheriff's fee, the Court noted the statute now codified as Cts. & Jud.Proc. art. § 7–402(a)(6), *supra,* and held, at 233: "Applying the rates set forth in the statute, the sheriff would appear to be entitled to $153.75. How a charge of nearly twice as much can be justified we are unable to say but counsel may wish to look into the matter if the property is resold."

The $153.75 approved by the Court necessarily ignored the $369,000 of mortgage liens on the property; it was based solely on the $15,750 bid over those liens. Appellees here ask that we disregard this aspect of *Buckeye* because, as we shall see, the Legislature subsequently annulled the Court's holding as to the *auctioneer's* fee. That does not,

however, serve to annul the holding as to the *sheriff's* fee, which apparently remains intact.

There was no discussion in *Buckeye* as to why the mortgage liens should not be considered in determining the amount of the sheriff's fee. It does not appear from the Opinion that those liens were actually assumed by the buyer, and it may be that the Court believed, in that circumstance, that only the debtor's equity was sold and that the effective price for it was only the cash bid. *Cf. Far. & Plan. Bank v. Martin,* 7 Md. 342, 345 (1855). It may also be that the real concern of the Court was that the actual fee exceeded even the maximum allowed by the statute, which could explain the Court's statement that the sheriff "would appear to be entitled to $153.75," rather than a flat holding that that was the limit of his entitlement. *Buckeye, supra* 243 Md. at 233, 220 A.2d 922. Whatever may have impelled the Court to its conclusion, however, we are not free to disregard it. Solely on the basis of *Buckeye,* therefore, we conclude that the trial court erred in allowing the sheriff anything more than $210.

## II. *Auctioneer's Fee*

As we indicated, in addition to the sheriff's fee, the *Buckeye* Court *sua sponte* addressed as well the auctioneer's fee of $415. It said as to that:

> "Whatever the practice may be in the several counties, we know of no statute or decision of this Court which permits the sheriff to employ an auctioneer and charge the cost thereof to the debtor. Nor are we aware of any reason why the sheriff, or one of his deputies, cannot conduct the auction at an execution sale.... It has been held that the sheriff cannot employ an auctioneer at the expense of the debtor without his consent.... This would seem to be the proper rule to be followed. The debtor might very well conclude it would be worth the cost of employing a professional auctioneer to have the bidders stimulated to a higher pitch of enthusiasm, but it seems to us an exorbitant price to pay for a service which

can be performed equally as well, in most cases, by the sheriff or one of his deputies, and especially so when the charges of the sheriff are taken into account."

*Id.*

In 1970, the General Assembly nullified this aspect of *Buckeye* by enacting a law, now codified in Md.Cts. & Jud.Proc.Code Ann. § 11–503, providing, with an exception for Harford County not relevant here, that "if a sheriff is required to sell real or personal property as part of his official duties, he may employ an auctioneer of his choice and charge the costs of the sale to the debtor." The authority to employ an auctioneer and charge his or her fee against the debtor is now clear.

Unfortunately, although the Code controls the fees that may be charged by the sheriff, it says nothing about the fees that can be charged by the auctioneer. There is a similar gap in the Md.Rules.

A forced sale of real property can occur in three principal settings: through foreclosure of a mortgage or deed of trust; through a "judicial sale"; and through a sheriff's sale pursuant to a writ of execution or garnishment.[1] The legal bases for these respective proceedings are quite different, and so are some of the procedures attending them. In the case of a judicial sale, such as a tax sale or a sale in lieu of partition, and in the case of a foreclosure sale conducted pursuant to a power contained in the mortgage, the court itself is regarded as the vendor, and the trustee conducting the sale is considered to be the court's agent. *See McCann v. McGinnis,* 257 Md. 499, 263 A.2d 536 (1970); *McCartney v. Frost,* 282 Md. 631, 386 A.2d 784 (1978). That is the historical, and practical, reason why the trustee must report to the court and the court must, in the end, ratify the sale. The procedures governing foreclosure sales

---

**1.** Property may also be sold to satisfy a vendor's lien, but the procedures attendant to that are the same as for a foreclosure. *See* Md. Real Prop.Code Ann. §§ 7–202 and 7–105.

are set forth in Ch. 1100, Subt. W of the Md.Rules; those governing judicial sales appear in Subt. BR of that Chapter.

A sheriff's sale, under traditional common law theory, arises in a different legal setting. As noted in Rorer, *Judicial and Execution Sales* § 46 (1873), quoted with approval in *McCartney v. Frost, supra,* 282 Md. 631 at 636, 386 A.2d 784.

> " 'In making ordinary execution sales, simply by virtue of his office, the sheriff or marshal acts as the ministerial officer of the law, not as the organ of the court. He is not its instrument or agent, as in judicial sales, and the court is not the vendor. His authority to sell rests on the law and on the writ, and does not, as in judicial sales, emanate from the court. The functions of the court terminate at the rendition of the judgment, except where confirmation of the sale is the practice. The court does not direct what shall be levied or sold, or how the sale shall be made. The law is the officer's only guide.' "

See also *Andrews v. Scotton,* 2 Bland. 636, 637 (1826), adding the notion, stemming from this theory, that while a judicial sale "is in no case binding and conclusive, until it has been expressly approved and ratified by the Court," if the sheriff "conforms to the established regulations applicable to all cases, (and he can sell in no other manner,) [a sheriff's] sale is final and valid as soon as it is made." As we shall see, that notion has been changed by the adoption, in 1984, of Md. Rule 2–644, which sets forth the procedures governing sheriff's sales.

Although the bases of and procedures governing foreclosure, judicial, and sheriff's sales are different, there is at least one common denominator; and that is Md.Rule BR6, which dictates the procedure to be followed after a judicial sale. Rule BR6 requires the person making the sale to file a report of it with the court. In the case of real property, after appropriate public notice and consideration of any exceptions that may be filed, the court will ratify the sale if satisfied that it was fairly and properly made. Section b 5

of the Rule provides that, upon final ratification of the report, "the papers in the proceeding may pursuant to Rule 2–543 be referred to the auditor to state an account." The Rule is silent as to what occurs if the court chooses *not* to refer the papers to an auditor.

Rule 2–543 deals with court auditors. It authorizes a court to refer to an auditor an action "in which it is necessary to examine, state, or settle accounts." It states the powers of an auditor, provides for a hearing before the auditor, and requires the auditor to file an account or report to the court. After considering the report and any timely exceptions that may be filed, the court then determines whether to ratify the report.

The Subt. BR Rules, as we said, apply only to a "judicial sale." That term is defined in Rule BR1 as encompassing a sale of property subject to ratification by a court but excluding a foreclosure sale under the Subt. W Rules and "a sale under a writ of levy or garnishment." Rule BR 6 (and through it, Rule 2–543) is made applicable to those excluded proceedings, however, through special provisions in Rules W 74 and 2–644. Rule W 74 e, dealing with foreclosure proceedings, provides that "[t]he procedure following a sale made pursuant to this Subtitle shall be as provided in Rule BR 5 (Real Property—Recording) and Rule BR 6 (Procedure Following Sale) of Subtitle BR (Sales—Judicial), except that an audit is mandatory." Similarly, but with one important difference, Rule 2–644(d), dealing with sheriff's sales, provides that "[t]he procedure following the sale of an interest in real property shall be as prescribed by Rule BR 6, except that the provision of Rule BR 6 b 5 for referral to an auditor does not apply."

To some extent, these procedural constructs preserve the traditional differences between sheriffs' sales on the one hand and judicial and foreclosure sales on the other. The exemption of sheriffs' sales from referral to a court auditor presumably arises from a recognition that the sheriff is not subject to the same degree of control by the court as a trustee. But by subjecting the sheriff to Rule BR 6 gener-

ally, the Court of Appeals necessarily determined that his independence from the court was by no means complete. In contrast to the principle stated by Chancellor Bland, the sale is *not* final and complete when made. Just like foreclosure and judicial sales, it too must be ratified by the court, and the court can examine its fairness. *See McCartney v. Frost, supra*, 282 Md. 631, 386 A.2d 784.

Though setting out the general procedure to be followed in making and reporting these three kinds of forced sales, none of these Rules attempts, directly, to control the fees that may be charged by those persons conducting or superintending the sale. In cases of foreclosure and judicial sales, three categories of people have sought such fees: trustees named or appointed to conduct the sale, auctioneers employed to *actually* conduct it, and attorneys who provide some legal advice or service to the trustee. In the case of sheriff's sales, there are two categories of fee-seekers: the sheriff and the auctioneer, if one is employed. It is not uncommon, then, in any of these kinds of sales, for one party or another (usually the debtor or property owner) to complain about both the amount and the aggregation of fees charged as expenses of the sale.

Traditionally, control over these fees, if there is any, has been left to local custom and practice. A clear underpinning of this, however, which both antedates the Maryland Rules and is implicit in them, is that, except as otherwise provided by supervening statute, the court has the authority to control both the amount and the aggregation of these fees. Nearly a century ago, it was pointed out that "[n]o trustee can be allowed to dispose of the proceeds without the express sanction of the court; if he pays away the proceeds of sale before ratification of the auditor's account he does so at his own risk." Miller, *Equity Procedure as Established in the Courts of Maryland* § 515 (1897). That express sanction is ordinarily given through the court's ratification or amendment of the auditor's account.

In the case of a sheriff's sale, as we noted, the provision of Rule BR 6 authorizing referral to an auditor is not

applicable. But control by the court is nonetheless implicit in Rule 2–644(f), which states:

> "The sheriff may withdraw from the proceeds of the sale all *appropriate* unpaid sheriff's expenses and fees incident to the enforcement proceedings. *Unless otherwise ordered by the court,* the sheriff shall distribute the balance of the proceeds of the sale, first to the judgment creditor in satisfaction of the amount owed under the judgment plus costs of the enforcement proceedings advanced by the creditor, and then, to the judgment debtor."

(Emphasis added.)

In the absence of any uniform State-wide rule governing these fees, some of the judicial circuits adopted local rules which, unfortunately, varied in both scope and content. All of these local rules provided for the compensation that may be allowed to a trustee who conducted a foreclosure or judicial sale; routinely, it was based on the proceeds obtained, subject to increase or decrease by the court in exceptional circumstances and, in some instances, to any provision in the underlying instrument. The provision for attorney's fees was more limited. All of the rules allowed for such fees where the instrument under which the sale is made provided for them; in most of the circuits, the rule permitted the court to charge such fees against the estate or the trustee's compensation, or to divide the fees between them as justice required. Whether, and to what extent, these local rules are still in effect is not entirely clear.

Only three circuits—the First, Second, and Third—appear to have adopted local rules making specific provision for auctioneer's fees, although the continuing validity and effect of those rules seem in particular to be in some doubt. It does seem evident that those circuits, and others, allow such fees by custom or some form of administrative order. In Baltimore City, auctioneers' fees are governed by local ordinance. Balto. City Code, art. 2, § 11 allows a commission, in a court-ordered sale of real property, of $3,250 on the first $100,000 and 2½% on the balance. First Circuit

Rule BR 1 e provides that auctioneers (and appraisers) "shall be paid such fees and commissions as the Court may allow in the particular case." The judges in that circuit, we are informed, regard that Rule as remaining in effect. Second Circuit Rule BR 8 f established a minimum fee for the sale of real estate of $25 and a maximum fee of $200. That maximum, however, was subject to increase by the court "for good cause shown." The rule further provided that:

"For these fees, [the auctioneer] shall not be required to perform any service prior to the actual sale to attract bidders but only to conduct the bidding at the sale and announce the names of purchasers, and file with the Court a written memorandum of the sale, signed by him, showing the name of the purchaser and the sale price."

We are informed that the Rule, as a Rule, has been discarded but that the judges continue to adhere to its content as a matter of judicial policy.

The Third Circuit Rule, which appears to have been the most liberal of the local rules, allowed, through a sliding percentage formula, $355 on the first $20,000 of proceeds and 1% of the balance over $20,000. As with the Second Circuit, that Rule appears to have been discarded as a Rule, but, by some administrative order or policy, the judges continue to follow it. We are unable to find any local rule in the Seventh Judicial Circuit or in St. Mary's County in particular governing auctioneer's fees. As we indicated, the sheriff, through one of his deputies, simply made an agreement with three auctioneers, without formal court approval, as to a set percentage fee he would pay in all cases, regardless of the nature of the sale, the amount received, or the work actually done by the auctioneer.

In 1977, the Court of Appeals' Rules Committee filed its 58th Report recommending the abolition of a host of local circuit rules in favor of new additions to the Md. Rules. Included within that Report was a proposed Md. Rule BR 7, providing a uniform basis for the compensation of trustees conducting judicial sales. Section b of that proposed Rule

entitled the trustee to receive from the proceeds of sale the reasonable expenses incurred in connection with the sale upon ratification of the auditor's account except "that an auctioneer's fee shall be paid by the Trustee out of his commission." This reflected the initial thinking of the Committee that the trustee was the one responsible for conducting the sale, that his compensation was in large part for that service, and that if he chose to employ an auctioneer for that purpose, the expense should be borne by him rather than the estate. Many comments were received with respect to the 58th Report, including a number that were critical of the proposal to have auctioneers' fees taken from the trustee's commissions. After reviewing these comments, the Committee reconsidered its position and, at its meeting in April, 1977, decided to recommend to the Court the deletion of that language.

The Court held the 58th Report for three years. In October, 1980, it deleted from proposed Rule BR 7 the quoted language dealing with auctioneer's fees, adopted the Rule as amended, and then immediately suspended the Rule and left the various local rules in effect "pending further study."

In an effort to obtain a consensus on these matters, the Rules Committee sought the assistance of the Maryland State Bar Association and the Auctioneers Association of Maryland. In June, 1984, the Rules Committee considered a draft of proposed Md. Rules BR 7 and 8 (at the time tentatively numbered Rules 2–797 and 2–798) that had been developed through the combined efforts of the Real Property Section of the State Bar Association, the Auctioneers Association, and the Property Subcommittee of the Rules Committee. After a great deal of debate, much of it centering on what fees should be allowed an auctioneer conducting a forced sale, whether any part of such fee should be charged against the estate rather than taken from the trustee's compensation, and whether, given the variation in local practices, it was feasible to have a uniform

rule,[2] the matter was continued until the Committee's September meeting when it was again discussed at some length. *See* Rules Committee minutes of June 22 and September 14, 1984. The end product of the Rules Committee's deliberations appeared as proposed Rules BR 7 and 8, included in the Committee's 92nd Report to the Court, filed in August, 1985.

Proposed Rule BR 8 dealt specifically with auctioneer's fees. For sales of real estate, it provided essentially that, unless the auctioneer's compensation was fixed in the instrument authorizing the sale, the auctioneer would be entitled to $150 if he "attends and calls the sale but performs no other substantial services." If he also performed "other substantial services," he would be entitled, through a sliding percentage scale, to $860 on the first $46,000 of proceeds and 2% on the balance. The proposed Rule also provided that the court could increase or decrease the compensation "upon a determination that the amount would

---

**2.** The problem with fashioning a uniform State-wide rule was well-articulated by Committee member Alexander G. Jones, Esq., who, according to the Minutes of that meeting,

"expressed the opinion that the many variables in local practices around the State are so numerous as to render unfeasible, if not impossible, the task of establishing a single uniform lump sum compensation that is fair and reasonable for the services rendered. For example, in some rural areas an advertisement in the local paper is sufficient to notify the whole community of the sale and there is no need for the special services of an auctioneer to drum up potential purchasers. In a large metropolitan area, on the other hand, the pre-sale attendance of an auctioneer may ordinarily be essential to solicit attendance at the sale of an adequate number of interested bidders."

Similar comments had been expressed earlier by an organization known as the Savings and Loan Lawyers of Maryland, Inc. In a letter to the Committee in response to the 58th Report, Richard B. Bland, Esq., on behalf of that organization, noted that in Baltimore City, the auctioneer "prepares the required legal advertisement, posts the property with signs and even prepares other advertising to attract buyers including direct mailings to potential buyers," whereas in other parts of the State, "these services are performed by the trustee or the attorney for the trustee, and the auctioneer merely attends the sale, auctions the property and forwards to the trustee his certificate."

be manifestly excessive or inadequate in the particular case."

Although the Auctioneers Association supported proposed Rule BR 8, that proposal and the companion proposal for trustees' compensation met with an even worse fate than the 1977 proposal. After two public hearings and an interim re-referral to the Rules Committee for clarification on certain points, the Court rejected the two proposals, preferring, at least for the time, to allow the matter to remain controlled by local rule.

As we have seen, the matter is not in fact controlled by local rule in St. Mary's County, for there appears to be no local rule. Indeed, there is some question, which we need not decide here, whether, in light of Md. Rule 1–102, local rules governing the compensation of auctioneers are even permissible.[3]

We draw from this long and tiresome history two principal conclusions. The first is that, although the Rules Committee, despite some diligent effort, has been unable to fashion a uniform Statewide rule governing auctioneers' fees that is acceptable to the Court of Appeals, the need to provide some kind and degree of court supervision over these fees has been clearly recognized. To the extent that a circuit court exercises supervision over forced sales of property, it does so as part of its equity jurisdiction, and it is inconsistent with fundamental equity principles for the

---

3. Md. Rule 1–102, which took effect July 1, 1984, provides that: "Unless inconsistent with these rules, circuit and local rules regulating (1) court libraries, (2) memorial proceedings, (3) auditors, (4) compensation of *trustees* in judicial sales, and (5) appointment of bail bond commissioners and licensing and regulation of bail bondsmen, are not repealed. *No circuit and local rules, other than ones regulating the matters and subjects listed in this Rule, shall be adopted.*" (Emphasis added.) Compensation of auctioneers, especially in sheriff's or foreclosure sales, would not appear to be within any of the excluded categories. Whether the last sentence of the Rule was intended actually to repeal other existing local rules or simply preclude future adoption of them is not entirely clear from the text.

court to allow the proceeds of sale to be siphoned off by unnecessary or unreasonably high fees and expenses.

■ The second conclusion we draw is that, while the court's control over sheriffs' sales is not as pervasive perhaps as over foreclosure and judicial sales, it does have some control over them. Aside from the requirement that the sale be reported to and ratified by the· court, as we indicated earlier Rule 2–644 allows the sheriff to withdraw from the proceeds "all *appropriate* unpaid sheriff's expenses and fees incident to the enforcement proceedings" and directs that "[u]nless otherwise ordered by the court" the sheriff shall distribute the balance of the proceeds. (Emphasis added.) This, if nothing else, establishes the court's control over the sheriff's fees and expenses. It also necessarily implies that the court, and not the sheriff, determines whether those fees and expenses are appropriate.

■ The amalgam of these conclusions leads us to the third, and dispositive, one—that the court erred in allowing a $4,430 auctioneer's fee in this instance. Given the limited amount of work done by Mr. Fitzgerald and the fact that only $27,000 was received above the existing liens, such a fee is simply unreasonable. The court may not defer to a policy established by the sheriff based on a fixed percentage of the sales price when that policy results in a fee that is unwarranted in the particular circumstances. It must, in each case, examine the work done and the contribution actually made by the auctioneer in light of the price received and approve a fee that fairly compensates, but does not overcompensate, the auctioneer for his or her services.

We shall vacate the order distributing the proceeds of sale and remand the case to the circuit court for recalculation of the sheriff's fee in accordance with Part I of this Opinion and for further consideration of the auctioneer's fee. The court will have to determine an appropriate fee for the minimal amount of work done by Mr. Fitzgerald and enter a revised order. In doing so, the court must at least

consider the testimony offered by Mr. Whitson, which we think it erroneously struck. Although foreclosure and sheriffs' sales may be different for some purposes, we fail to see, and the record does not disclose, how the work of an auctioneer in calling the sale is any different or why any different level of compensation should be allowed. Whatever fee is approved should be allowed as a cost of the sale. Such treatment does indeed charge the fee to the debtor as the statute requires.

ORDER VACATED; CASE REMANDED TO CIRCUIT COURT FOR ST. MARY'S COUNTY FOR FURTHER PROCEEDINGS; APPELLEE TO PAY THE COSTS.