Nancy A. LEE, Claimant-Respondent,

v.

STATE DEPARTMENT OF PUBLIC
HEALTH AND WELFARE,
Defendant-Appellant.

No. 9177.

Missouri Court of Appeals,
Springfield District.

April 27, 1972.

Frederick E. Steck, Sikeston, for claimant-respondent.

Elmore G. Crowe, Edward D. Summers, Jefferson City, for defendant-appellant.

TITUS, Chief Judge.

Nancy Lee, a 93-year-old widow residing in a nursing home, was dependent upon her son James, social security benefits, and old age assistance. Chapter 208.[1] James, under informal authority from Mrs. Lee, managed his mother's meager affairs because, in her own words, "I ain't fit to take care of nothing." On July 27, 1970, a caseworker for the division of welfare terminated Mrs. Lee's old age assistance on the averred ground that she owned or possessed available resources in the form of cash and securities (prepaid burial deposits) in excess of the amount allowed under § 208.010, subsec. 2, subd. (3).[2] Mrs. Lee appealed from the closing of her case (§ 208.080) and also reapplied for benefits, but this application was rejected because she allegedly had transferred money to James "without receiving fair and valuable consideration" contrary to § 208.010, subsec. 2, subd. (1) (a).[3] Both the closing and the rejection were issues at a hearing conducted October 22, 1970, by a referee in the absence of the director of the department of public health and welfare. Subsequent to the hearing, the director also denied benefits to Mrs. Lee based upon findings to be detailed presently. Mrs. Lee appealed to the Circuit Court of New Madrid County which determined, inter alia, that the director's decision was arbitrary and unreasonable. In keeping with that determination, the circuit court remanded the proceedings for redetermination of the issues by the director. § 208.100. Thereafter, the department appealed to this court. § 208.110.

### Prearranged Burial Contracts

In 1936, Mrs. Lee and her husband started paying on a $400 prearranged burial contract with the Bisplinghoff Funeral Home. "[T]here was nothing in [the agreement] that stated a person could come in and demand their money back."[4] This contract was overpaid by $3, and in 1952, $200 thereof was applied on the husband's funeral. Mrs. Lee entered into a second contract with the funeral home for $250 in 1958, which was fully paid in 1968 with James, her son, having personally paid at least $115

---

1. Statutory references are to RSMo 1969, V.A.M.S.

2. Sec. 208.010, subsec. 2, subd. (3)—"2. Benefits shall not be payable to any claimant who: . . . (3) Owns or possesses cash or securities in the sum of one thousand dollars or more; . . ."

3. Sec. 208.010, subsec. 2, subd. (1) (a)— "2. Benefits shall not be payable to any claimant who: (1) (a) Has, . . . encumbered, assigned, conveyed, or transferred real or personal property, of which he is the record or beneficial owner, or any interest therein of any value within five years preceding the date of the investigation without receiving fair and valuable consideration. . . . *'Fair and valuable consideration'* as used herein means money or real or personal property received at the time of the transaction approximately equal to the value of the property encumbered, assigned, conveyed or transferred, and shall not for the purpose of this section be construed to include support, services, or other advancements made to or to be made by a relative to a claimant. A payment of a loan to a relative may be recognized and eligibility not affected if the claimant can establish to the satisfaction of the division of welfare that the loan was bona fide and the proceeds of the loan were used by the claimant for his or his dependents' support or benefit."

4. The 1936 contract was not in evidence, and the quote is all that is known regarding its contents.

on that agreement. The 1958 contract recites that "Nothing herein contained shall be construed as a policy of insurance whereby the Bisplinghoff Funeral Home agrees to pay any money under the terms of this agreement" and that "In no event will installments be returned in cash." A representative of the funeral home testified that by reason of the two contracts Mrs. Lee "has a credit at [the funeral home] of $453 right now" to apply on her funeral. The witness, who described himself as "half-owner" of the partnership, also stated that in spite of any contractual or statutory provisions (presumably § 436.010 et seq.), it was the present policy of the funeral home to give "back all the money they had paid in" should such a request be made.

### Cash

The only cash of record attributable to Mrs. Lee had its origin in the sale of a house in Chaffee, Missouri, which the city collector appraised as having a value of $750. It is not clear which members of the Lee family had legal title to this real estate, but Mrs. Lee and all of her children executed the necessary deed or deeds which permitted James to sell the property for $1,000. Mrs. Lee was aware that James "had been paying out money to help" her and that "he had been paying debts for me too." She testified that she had promised "to pay it back to him" when she could, but this had not been possible until the house was sold; Mrs. Lee further stated that she wanted James to be "paid any money" she owed from the proceeds of the sale. Concerning the proceeds, James understood "I was to take my money out of that, what I had coming to me."

After deducting abstract and legal expenses attending the sale of the house, James deposited $932 in a bank on June 15, 1970, to the account of his mother, himself and his wife. On the same day the new account was established, James wrote a $139.05 check to a furniture store for a reclining vibrator chair which was delivered to Mrs. Lee at the nursing home. This left a bank balance of $792.95. Then on July 20, 1970, James wrote a check on the new account payable to himself in the sum of $444.20 to reimburse "myself for things I had paid out for my mother and expenses that I had had." The balance of the account was then $348.75.

James recounted the $444.20 check represented reimbursement only for money he had recently or during "the last few years . . . spent out of my pocket" to discharge obligations incurred by his mother, and did not represent all the help he had given her. As noted on the check itself, and as the other exhibits and testimony attested, the $444.20 was reimbursement for $115 James had paid on his mother's 1958 burial contract, $40 paid for ambulance services rendered Mrs. Lee, $41.09 paid in taxes, and $248.11 paid to the nursing home for bills the claimant had incurred which "the welfare didn't cover." The nursing home statements paid by James represented charges made against his mother's account for items other than room, board and nursing care during a period of nine months from October 1969 through June 1970. Four paid checks drawn on James' personal account dated in January, March, May and June 1970 and payable to the nursing home, and a June 1970 receipt given to James by the nursing home were received as exhibits to evidence that James had paid $248.11 to that institution for his mother.

### Social Security Benefits

The sole evidence anent social security benefits paid to Mrs. Lee is contained in the testimony of James. He said his mother had been receiving such benefits for "about one year" before the October 1970 hearing and at that time the payments were $42 a month. James, according to his testimony, spent these benefits for his mother through the purchase of items not furnished or billed by the nursing home. None of the social security payments, James stated, went as credit for or to discharge any of the matters for which he claimed reimbursement. He asserted that he was not asking

"for payment back" of any of the social security payments he had expended on behalf of Mrs. Lee.

### The Director's Findings of Fact and Decision

Pertinent parts of the findings of fact and decision of the director of the department of public health and welfare are:

"The claimant authorized her son James to negotiate a sale of her home and agreed that whatever advancements of money he might make in her behalf should be reimbursed from the proceeds of the sale. This was done, but the reimbursement, in the form of a check for $444.20 . . . embraced an overcharge of $210.00 because of his failure to credit his mother with $42 per month Social Security benefits received over a five-month period during which he charged for his payment for extra services and incidentals furnished at the Nursing Home. Because of said overcharge James Lee is and was, on July 20, 1970, indebted to his mother in the sum of $210.00 and that debt was an available resource, and her aggregate available resources when her case was closed on July 27th was the sum of her bank balance $349.75 plus $210 and her $453 in prepaid burial deposits or $1,012.-75. The said overcharge of $210 made the $444.20 withdrawal a transfer of cash without fair and valuable consideration to the extent of $210.00. The claimant was ineligible when her case was closed because she owned resources in cash and debts, which she could readily convert to cash, in excess of $1,000.00, . . .. She transferred $210 cash . . ., without receiving fair .and valuable consideration . . ., and thereby disqualified herself . . .."

■ Our review of this cause is upon the record (Wallin v. State Dept. of Public Health & Welfare, Mo. (banc), 422 S.W.2d 345, 347), but it does not permit of an exploration to determine whether the circuit court or this court, upon a de novo consideration thereof, could logically reach conclusions opposite to those arrived at by the director. Dysart v. State Dept. of Public Health & Welfare, Mo.App., 361 S.W.2d 347, 350(1). However, if there be no substantial or probative evidence to support the director's findings, his decision may not stand for it will be deemed arbitrary and unreasonable. Dunnegan v. Gallop, Mo.App., 374 S.W.2d 407, 410(2). "The minimum standard for any administrative decision is that it be supported by competent and substantial evidence" (Mid-Continent Aerial Sprayers, Inc. v. Industrial Commission of Mo., Mo.App., 420 S.W.2d 354, 361), and a "determination as to whether the decision . . . is supported by competent and substantial evidence . . . can only be made by reference to such evidence as is incorporated in the record presented for review." Koplar v. State Tax Commission, Mo., 321 S.W.2d 686, 695(8).

The director, as noted, concluded that James had overcharged the reimbursement to himself by $210 because he failed "to credit his mother with $42 per month Social Security benefits received over a five-month period during which he charged for his payment for extra services and incidentals furnished at the nursing home." To our mind this smacks of inconsistency. It is initially observed that the nursing home bills covered a period of nine months, not five, and that the statements were paid over a period of six months in the four months of January, March, May and June, and not in or over a span of five months as the director's conclusions would indicate. Also, if the director believed that James had converted any of the social security benefits to his own use or credit, what basis existed for the director to lay an exaggerated stress on or limit the alleged conversions to any particular five-month period, or to assign the benefits as payments or credits on the nursing home bills when three other discharged obligations existed for which James was claiming credit?

■ Albeit the only evidence on the subject is James' asseverations that the $444.20 check he wrote to himself for reimbursement purposes represented obligations of his mother which he had discharged from his personal funds, and that social security benefits were not used by or credited to him nor employed in making any of the payments for which he claimed credit, we are constrained by the opinions to give the director free rein to pick and choose what he will or will not believe. Thornsberry v. State Dept. of Public Health & Welfare, 365 Mo. (banc) 1217, 1224, 295 S.W.2d 372, 376(5). But be that as it may, we hold that the director erred in concluding that Mrs. Lee had "transferred $210 cash" via the $444.20 check James wrote to himself, and erred in viewing the burial contracts as "cash or securities."

■ If there was, in fact, a transfer via an overcharge of $210 as concluded by the director, it was effected or caused by the act of James in writing the $444.20 check. While Mrs. Lee was agreeable that James should be reimbursed for her obligations he had paid, there is no evidence that she agreed to an overcharge or that she did anything to effect or bring about the so-called overcharge or transfer through $444.20 check. Section 208.010, subsec. 2, subd. (1) (a), partly quoted in note 3, serves to withhold benefits from *any* *claimant who has transferred* property without receiving fair and valuable consideration. "Any claimant who has transferred" is a relative clause; the antecedent of "who" is "claimant," and "who" is a relative pronoun dependent upon "claimant." Ergo, the statute condemns transfers produced or at least acquiesced in by a claimant; it does not undertake to discipline a claimant who is wholly passive in the matter and where the transfer results from the independent acts of third persons. Moreover, "transfer" is a transitive verb (The American Heritage Dictionary of the English Language, p. 1363); "and, in ordinary usage of that term, an *active* *transitive* effect or concept is implied there-

by and inherent therein. So, where a statutory definition of the term has not been involved, 'transfer' has been defined as ' "the act by which the owner of a thing delivers it to another with the intent of passing the right he has in it to the latter." ' Instant claimant's nonaction was the very antithesis of an 'act by which the owner of a thing delivers it to another . . . .' " Bradley v. Hill, Mo.App., 457 S.W.2d 212, 216.

■ "Black's Law Dictionary defines 'Securities' as 'Evidences of debts or of property. Evidences of obligations to pay money or of rights to participate in earnings and distribution of corporate, trust, and other property.' Webster's Third New International Dictionary defines 'Security' as 'a written obligation, evidence, or document of ownership or creditorship (as a stock, bond, note, debenture, or certificate) giving the holder the right to demand and receive property not in his possession . . . .' This last definition received the approval of the court in First National Bank of Kansas City v. Hyde, Mo., 363 S.W.2d 647, 653 [11]. Both are broad in their language and would include any document setting forth an obligation to pay money . . . ." Wigand v. State Dept. of Public Health & Welfare, Mo.App., 454 S.W.2d 951, 956. " 'Securities' " also mean "written assurances for the return or payment of money; written promises or assurances for the payment of money" (79 C.J.S. Security; Securities, at p. 946), and "to establish that an instrument or certificate is a security, it must be shown that such instrument or certificate represents an investment in a designated portion of the assets and capital of a concern with the hope of receiving a profit solely through the efforts of persons other than the investor." Emery v. So-Soft of Ohio, Inc., 94 Ohio Law Abst. 357, 30 Ohio Op.2d 226, 199 N.E.2d 120, 124(2), and cases cited at pp. 123–124. The prearranged burial contracts did not represent "cash," which is "money or currency issued /by lawful authority intended to pass and circulate as

**310**

such, . . . ." State v. Darby, Mo., 165 S.W.2d 419, 420, quoting Neufield v. United States, 73 App.D.C. 174, 118 F.2d 375, 387, cert. denied, Ruben v. United States, 315 U.S. 798, 62 S.Ct. 580, 86 L.Ed. 1199. Neither were the agreements securities; they did not evidence, in writing, any obligation to return or pay money; they did not give Mrs. Lee any right to demand and receive property not in her possession; and they did not represent any interest in the assets or capital of the funeral home. A security cannot be conjured from oral statements of the "half-owner" of the funeral home that it was the gratuitous custom of the partnership to return money upon request which had been deposited on contracts, contrary to the written terms of the agreements and the law. § 436.010 et seq.

The judgment of the court nisi is affirmed.

STONE and HOGAN, JJ., concur.