1998 SD 16

Terry R. GREENE, Plaintiff
and Appellant,

v.

MORGAN, THEELER, COGLEY & PET-
ERSEN, Lawyers, and Jack Theeler,
Defendants and Appellees.

No. 20059.

Supreme Court of South Dakota.

Argued Dec. 4, 1997.

Decided Feb. 18, 1998.

Timothy L. James of James & Associates, Yankton, for plaintiff and appellant.

William Fuller of Woods, Fuller, Schultz & Smith, Sioux Falls, for defendants and appellees.

MILLER, Chief Justice.

[¶ 1.] In 1988, attorney Jack Theeler prepared an antenuptial agreement for Terry Greene. The agreement, among other things, purported to waive any right that Greene's fiancee would have to alimony should the couple ever divorce. When the couple ultimately divorced in 1993, the trial court awarded alimony to Greene's wife, ruling that the part of the agreement waiving alimony was invalid under South Dakota law. Greene brought this legal malpractice action against Theeler and his law firm. The trial court granted summary judgment to Theeler and the law firm, holding that the three-year statute of limitations had run on the malpractice claim. Greene appeals. We affirm in part and reverse and remand in part.

## FACTS

[¶ 2.] Terry Greene was the sole shareholder of Terry's Propane, Inc. of Mitchell, South Dakota. After the dissolution of his first marriage in 1985, he began to discuss marriage with his soon-to-be second wife, Pamela. They originally planned to marry in 1987, and met with attorney Theeler in the fall of 1987 to prepare an antenuptial agreement. Greene had told Pamela that he would not get married unless they executed such an agreement as a means of protecting his business and personal assets. Theeler had represented Greene previously when Greene was setting up his business. He also represented Greene during his divorce from his first wife and in other incidental legal matters.[1] For undisclosed reasons, the marriage was postponed until June 25, 1988. Two days prior to the marriage, Greene and Pamela returned to Theeler to finalize the agreement. Among other things, it provided: "Each of the parties do hereby further waive and release all rights including, but not limited to, ... alimony, support or otherwise[.]"

[¶ 3.] Following the marriage, Theeler continued to represent Greene by providing estate planning and asset protection advice. In 1993 Pamela initiated a divorce action. Theeler initially represented Greene in that action, but withdrew when it became necessary for him to testify as a witness. The divorce court properly determined the portion of the agreement that waived alimony and support was invalid because it was violative of the public policy of our state as held in *Connolly v. Connolly*, 270 N.W.2d 44, 46 (S.D.1978). Theeler even later testified in his deposition that at the time the agreement was signed he knew the case law in South Dakota prohibited alimony waivers in antenuptial agreements. Thus, Pamela was awarded alimony payments of $1,000 per month for twenty-four months.

[¶ 4.] Greene then instituted an action for legal malpractice against Theeler and his law firm of Morgan, Theeler, Cogley & Peterson, Lawyers. Theeler and the firm made a motion for summary judgment, asserting the three-year statute of limitations had run on

---

1. Theeler had represented Pamela in an action for foreclosure on her home. Theeler advised Pamela that he represented Greene in the negotiations involving the antenuptial agreement and that she could retain independent counsel. Pamela declined to do so.

Greene's legal malpractice claim. The trial court granted summary judgment.

[¶ 5.] Greene appeals, claiming the granting of summary judgment was inappropriate because the statute of limitations was tolled either by the continuous representation doctrine, or fraudulent concealment.

## STANDARD OF REVIEW

[¶ 6.] The standard under which we review summary judgment is well established:

"Summary judgment shall be granted 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' We will affirm only when there are no genuine issues of material fact and the legal questions have been correctly decided. All reasonable inferences drawn from the facts must be viewed in favor of the nonmoving party. The burden is on the moving party to clearly show an absence of any genuine issue of material fact and an entitlement to judgment as a matter of law. On the other hand, '[t]he party opposing a motion for summary judgment must be diligent in resisting the motion, and mere general allegations and denials which do not set forth specific facts will not prevent issuance of a judgment.'"

*Schultz v. Dew*, 1997 SD 72, ¶ 11, 564 N.W.2d 320, 322 (quoting *Ward v. Lange*, 1996 SD 113, ¶ 10, 553 N.W.2d 246, 249). Normally, statute of limitations questions are to be resolved by the jury. *Schoenrock v. Tappe*, 419 N.W.2d 197, 200 (S.D.1988). Summary judgment is proper on statute of limitations issues only when application of the law is in question, and not when there are remaining issues of material fact. *Kurylas, Inc. v. Bradsky*, 452 N.W.2d 111, 113 (S.D.1990).

## STATUTE OF LIMITATIONS FOR LEGAL MALPRACTICE

[¶ 7.] The statute of limitations for legal malpractice actions in South Dakota is found in SDCL 15-2-14.2, which provides:

An action against a licensed attorney, his agent or employee, for malpractice, error, mistake or omission, whether based upon contract or tort, can be commenced only within three years after the alleged malpractice, error, mistake or omission shall have occurred. This section shall be prospective in application.

We have often stated that, absent fraudulent concealment of an attorney's negligent advice, the statute of limitations begins to run from the "occurrence" of the alleged negligence, and not from when the negligence is discovered or the consequential damages are imposed. *Keegan v. First Bank of Sioux Falls*, 519 N.W.2d 607, 612 (S.D.1994); *Kurylas*, 452 N.W.2d at 114; *Schoenrock*, 419 N.W.2d at 199; *Hoffman v. Johnson*, 374 N.W.2d 117, 122 (S.D.1985).

[¶ 8.] Greene's cause of action against Theeler began to run in 1988 when the agreement was signed. Greene did not serve Theeler with the summons and complaint in his malpractice suit until 1996, well after the three-year statute of limitations had run. Since the statute of limitations had run, the granting of summary judgment is presumed correct, and the burden is thus on Greene to establish the existence of material facts to show the statute of limitations was somehow tolled. *See Keegan*, 519 N.W.2d at 615 (citing *Kurylas*, 452 N.W.2d at 117).

[¶ 9.] Under our "occurrence rule" for legal malpractice actions, the three-year statute of limitations "will be tolled until the cause of action is discovered or might have been discovered, if there is fraudulent concealment of the cause of action." *Glad v. Gunderson, Farrar, Aldrich & DeMersseman*, 378 N.W.2d 680, 682 (S.D.1985) (citing *Holy Cross Parish v. Huether*, 308 N.W.2d 575, 577 (S.D.1981); *Hinkle v. Hargens*, 76 S.D. 520, 524–25, 81 N.W.2d 888, 890–91 (1957)). We have stated the general rule as to fraudulent concealment and the statute of limitations as:

[I]n summary judgment proceedings where the defendant asserts the statute of limitations as a bar to the action, and presumptively establishes the defense by showing the case was instituted beyond the statutory period, the burden then shifts to

the plaintiff to establish the existence of material facts in avoidance of the statute of limitations, e.g., fraudulent concealment of the cause of action.

*Glad,* 378 N.W.2d at 682 (citations omitted); *see also Keegan,* 519 N.W.2d at 615; *Kurylas,* 452 N.W.2d at 117.

[¶ 10.] We have also consistently held that the continuous representation doctrine, adopted from the continuous treatment doctrine in medical malpractice cases, can likewise serve to toll the statute of limitations for legal malpractice. *Keegan,* 519 N.W.2d at 613; *Kurylas,* 452 N.W.2d at 115; *Schoenrock,* 419 N.W.2d at 200.

## DECISION

[¶ 11.] **I. Continuous representation doctrine.**

[¶ 12.] Greene argues the grant of summary judgment was improper because material issues of fact exist as to whether the statute of limitations was tolled under the continuous representation doctrine. We disagree.

[¶ 13.] The continuous representation doctrine in a legal malpractice action applies when there is a:

[C]lear indicia of an ongoing, continuous, developing, and dependent relationship between the client and the attorney[.] This relationship is one which is not sporadic but developing and involves a continuity of the professional services from which the alleged malpractice stems. Furthermore, the application of this doctrine should only be applied where the professional's involvement after the alleged malpractice is for the performance of the *same or related services* and is not merely continuity of a general professional relationship.

*Keegan,* 519 N.W.2d at 613 (citations and internal quotations omitted) (emphasis added). The continuous representation itself must occur before the three-year statute of limitations has run, to effectively toll it. *Id.* (citing *Schoenrock,* 419 N.W.2d at 201–02).

[¶ 14.] Theeler does not really argue with the claim that, during the divorce proceedings in 1993, he represented Greene with respect to the agreement. Greene claims that during that time he was constantly reassured by Theeler that the agreement was enforceable and Theeler made attempts to enforce the agreement. Rather, Theeler argues that, even assuming the divorce proceedings in 1993 constituted continuous representation as to the agreement, such was too late to revive the cause of action. This assertion is correct. *See Schoenrock,* 419 N.W.2d at 201. Therefore, our analysis must focus on the time period between the signing of the agreement in 1988 and the subsequent divorce proceedings in 1993.

[¶ 15.] Greene points to instances in 1990 and 1991 in which he engaged in discussions with Theeler concerning estate planning and asset protection. He claims the agreement was a small part of his overall estate planning and asset protection scheme. Theeler, on the other hand, argues that the instances of estate planning and asset protection do not fit into the definition of "continuous representation" so as to toll the statute of limitations. Rather, he claims that such representation by him was merely evidence of a general professional relationship, but unrelated to the agreement.

[¶ 16.] We hold that Greene has failed to overcome his burden under the continuous representation doctrine. Greene and Theeler had an ongoing, continuous relationship; however, this relationship was not related to the alleged negligent act involving the antenuptial agreement. Greene has made broad statements that the agreement was a part of his larger asset protection plans. While this may be true, to apply the continuous representation doctrine in such an attenuated fashion would be improper. *See Smith v. Stacy,* 198 W.Va. 498, 482 S.E.2d 115, 121 (1996) (holding: "[T]he limitations period for a legal malpractice claim is not tolled by the continuous representation rule where an attorney's subsequent role is only tangentially related to legal representation the attorney provided in the matter in which he was allegedly negligent").

[¶ 17.] In *Kurylas,* we were faced with a situation in which Kurylas presented records from the defendant's law firm indicating several instances of contact between Kurylas

and his attorney after the allegedly negligent incident had occurred. 452 N.W.2d at 115. We held that the relevance of the evidence was questionable because it did not prove, among other things, that the later professional services and the alleged omission were related. *Id.* at 116.

[¶ 18.] Likewise, Greene has failed to prove that his later meetings with Theeler were related to the agreement. Almost any work performed by an attorney could arguably be classified as asset protection or estate planning in some fashion or another, and to hold that the continuous representation doctrine should apply in such a situation would defeat the purpose of the doctrine. *See Smith,* 482 S.E.2d at 121 (observing that the doctrine has a dual purpose in that it protects the attorney-client relationship by affording the attorney an opportunity to remedy an error, while also preventing the attorney from defeating a client's cause of action by delay) (citing *Wall v. Lewis,* 393 N.W.2d 758, 763 (N.D.1986)). At best, the facts presented by Greene indicate the "continuity of a general professional relationship." That is not enough. *See Schoenrock,* 419 N.W.2d at 201. Therefore, the granting of summary judgment on this issue was correct and we affirm.

[¶ 19.] **II. Fraudulent concealment.**

■ [¶ 20.] Greene next argues that there are issues of material fact yet to be decided on the issue of fraudulent concealment so as to make summary judgment inappropriate. We agree.

[¶ 21.] Theeler first claims this issue is not properly before this Court. He claims the issue was never argued to the trial court, and the trial court did not properly rule on the issue of fraudulent concealment.[2]

[¶ 22.] Greene did argue fraudulent concealment to the trial court at the hearing on the motion for summary judgment, and the trial court ruled on it.[3] In reviewing the transcript from the hearing on the motion for summary judgment, it is apparent that the issue was raised. While Greene did not use the specific words "fraudulent concealment" in his argument, it is clear that this was one of two theories he was presenting. Greene argued to the trial court:

> Well, your Honor, there is no discovery theory in this state, especially in light of the recent ruling. I don't have the name of the case right in front of me but that Will case that Mr. Theeler or Mr. Fuller had referred to. The point being, though, that there is ample authority in this case that if it was because of the conduct of the attorney that you couldn't find out that he *concealed* this or *failed to disclose* it to the client that it would continue anyway, *you don't even need the continuing representation rule then.* (Emphasis added.)

Greene also specifically argued later in the hearing that it was Theeler's conduct of reassuring him that the agreement was valid, besides the continuing representation theory, that also tolled the statute of limitations.

[¶ 23.] It is clear that Greene presented two theories at the hearing: One based on continuing representation and one based on Theeler's concealment of the fact that the alimony waiver was invalid. Further, the judge ruled on both theories by stating: "[T]he Defendant is entitled to summary judgment because there was no continuing representation *nor* actionable fraud[.]" (Emphasis added.) The issue is properly before us at this time.

[¶ 24.] Greene points to Theeler's deposition as evidence of factual issues that indicate Theeler knew the alimony waiver was invalid and that he fraudulently concealed this from

---

2. Theeler also argues that the issue of fraud was not properly pleaded as per SDCL 15–6–9(b). This argument is without merit as Greene is not alleging a claim of fraud upon which to recover damages. Rather, he has raised the issue of fraudulent concealment, as was his duty, to combat Theeler's defense of the statute of limitations. *See Glad,* 378 N.W.2d at 682 (stating that at a summary judgment hearing, once the defendant raises the defense of the statute of limitations, the burden shifts to the plaintiff to establish issues of material fact, such as fraudulent concealment, to avoid the statute of limitations).

3. Greene cites to his brief in opposition to the motion for summary judgment as evidence of raising the fraudulent concealment issue. The briefs from this hearing were not made a part of the record available on appeal and we therefore cannot consider them.

Greene. The following occurred during Theeler's deposition:

Q. Did you ever discuss with Terry Greene, that you recall, there was case law in existence in South Dakota at the time you discussed it in 1988, antenuptials, that indicated there could not be a waiver of alimony?

A. I don't recall a specific conversation about that.

Q. Were you aware of that at the time you drafted the antenuptial, which was executed in [J]une, 1988?

A. I am sure I was.

Q. Had you read the decision, specifically, prior to that time?

A. It had been kind of a bench mark on that issue since the seventies. I will tell you my position and you can tell me to shut up.

This testimony indicates Theeler knew the alimony waiver was not valid and that he does not remember so advising Greene. This, coupled with Greene's statements in his affidavit that Theeler had always assured him that the agreement was valid, creates issues of material fact that Theeler fraudulently concealed this defect in the agreement from Greene.

[¶ 25.] Theeler argues that Greene has not shown the requisite intent for fraudulent concealment. He claims his reason for putting the alimony waiver in the agreement was because: "[Y]ou don't know what the case law is going to be by the time you die or divorce. You don't know what the law will be, or what the jurisdiction will be." He maintains he lacked intent and that he had a legitimate reason for putting the waiver in, and just because Greene did not understand his reasons for including the waiver, such does not constitute fraud. Theeler argues that to hold silence is enough to establish fraudulent concealment would be to hold every attorney liable for a mistake even if the attorney did not recognize it. We do not agree.

[¶ 26.] We have always held that silence can constitute fraudulent concealment in certain cases:

[I]n South Dakota, if a trust or confidential relationship exists between the parties, which imposes a duty to disclose, mere silence, by the one under that duty constitutes fraudulent concealment and thus tolls the applicable statute of limitations.

*Glad*, 378 N.W.2d at 682–83. "The silence, however, must concern defects which the party with the duty to disclose *knew or should have known.*" *Id.* (citation omitted) (emphasis in original). We have also held that there is a relationship of trust or confidence between an attorney and client. *Id.* at 682. It appears that Theeler knew the case law provided the alimony waiver was invalid at the time the agreement was drafted. Thus, Theeler's alleged knowing failure to disclose to Greene that the alimony waiver was invalid is sufficient to establish material facts still at issue in regards to fraudulent concealment.

[¶ 27.] Therefore, summary judgment was inappropriate. We reverse and remand for proceedings consistent with this opinion.

[¶ 28.] AMUNDSON and KONENKAMP, JJ., and MARTIN, Circuit Judge, concur.

[¶ 29.] GILBERTSON, J., concurs in part and dissents in part.

[¶ 30.] MARTIN, Circuit Judge, sitting for SABERS, J., disqualified.

GILBERTSON, Justice (concurring in part and dissenting in part).

[¶ 31.] I concur on issue one and respectfully dissent on issue two. The majority analyzes this case on the basis of whether there is a question of fact as to fraudulent concealment by the attorney. Conceding that issue in favor of the client is not the end of the matter, but instead brings us to the real issue; where a client commits intentional abusive acts upon his spouse which are the basis for an award of alimony, will our public policy as set forth in our statutes and case law allow the wrongdoer to shift liability for his wrongful acts to his attorney?

[¶ 32.] This litigation is the off-spring of a divorce between Terry Greene (Terry) and his ex-wife Pamela Greene (Pamela). It was prior to this marriage that Terry consulted

Theeler in an effort to protect his assets from a potential divorce. The result of this was the antenuptial agreement which included the void provision precluding alimony.

[¶ 33.] "An attorney is liable in a malpractice action only for losses actually sustained as a proximate result of the conduct of an attorney." *Staab v. Cameron*, 351 N.W.2d 463, 466 (S.D.1984) (citing *Taylor Oil Co. v. Weisensee*, 334 N.W.2d 27 (S.D.1983)). Here Terry is bound by the findings of the trial court in the divorce. He appealed those findings and we summarily affirmed. *Greene v. Greene*, 546 N.W.2d 404 (S.D.1996).

[¶ 34.] A review of our case law on divorce shows it is unusual for a court to award alimony in a marriage which had the brevity of four years. However, in awarding alimony the trial court in the divorce trial went into great detail as to Terry's fault.[4]

> The Court finds that [Terry] is at fault in his conduct during the marriage and leading up to the separation of the parties, that the treatment of [Pamela] as testified to at the trial *was not denied by [Terry]* and has resulted in extreme humiliation and loss of self-esteem to [Pamela]. (Emphasis added.)

What was the nature of this undisputed "fault?" Terry deliberately sought to "bury" a substantial portion of his profits from his business in the business to shelter them from any claims by Pamela. He also bought assets in the business name which were purely personal, such as a lake home. The most grievous misconduct, however, was of a more personal nature.

> The Court finds that during the marriage Terry was unreasonably controlling of Pamela's schedule and activities. During the marriage Terry was verbally abusive of Pamela and would make demeaning and humiliating statements to Pamela or to others about Pamela. In December 1992, Terry indicated to Pamela that if he could give her AIDS without getting it himself,

he would. Approximately one week later Terry told Pamela that he had one shell for his gun and it was meant for her. Terry's actions and statements made Pamela fearful, caused her to move out of the marital home and file for divorce.

In contrast, there is no finding of any marital misconduct by Pamela. Not surprisingly, the trial court concluded:

> From the testimony, the Court finds that the defendant had been extremely cruel, controlling, overly domineering of the plaintiff during the course of the marriage. The defendant also had been involved with extremely outrageous conduct in allegations and statements made to the plaintiff.

[¶ 35.] I would submit that our holding in *Staab* should be controlling here. In *Staab*, there were a series of legal actions between a buyer and seller over the validity of an agreement for the sale of land. After three appeals to this Court, we held that there existed a valid contract for the sale of the land. *Staab*, 351 N.W.2d at 463. The seller then instituted an action against her attorney, Cameron. In upholding summary judgment for Cameron, we held:

> [T]he delays in closing the deal, and any losses suffered therefrom, were the direct result of Staab's [the seller's] own actions in entering this particular contract with Skoglund [the buyer]. The effect of the *Staab* decisions is to preclude Cameron from being the cause of the damages alleged by Staab; whatever [Cameron] did or did not do had no effect on the ultimate result.

*Staab*, 351 N.W.2d at 466. *See also Himrich v. Carpenter*, 1997 SD 116, 569 N.W.2d 568;[5] *Weiss v. Van Norman*, 1997 SD 40, 562 N.W.2d 113; *Grand State Property, Inc. v. Woods, Fuller, Shultz, & Smith, P.C.*, 1996 SD 139, 556 N.W.2d 84.

[¶ 36.] SDCL 25–2–18 recognizes the validity of *premarital* agreements except "where

---

4. We take judicial notice of our previous cases. In addition, Theeler petitioned for judicial notice of the findings of fact, conclusions of law and attached memorandums in the divorce trial. By order dated August 22, 1997, we granted this request.

5. Contrary to any suggestion that there is a question of fact in these types of cases, *Staab, Weiss, Grand State* and *Himrich* were all decided at the summary judgment stage of the litigation and were affirmed by this Court.

in violation of public policy." In *Connolly v. Connolly*, 270 N.W.2d 44 (S.D.1978), we held it violated public policy as set forth in SDCL 25–2–13 and SDCL 25–4–41 to recognize the validity of an agreement which would be a waiver of support via alimony. The first sentence of SDCL 25–2–13 states, "[a] husband and wife cannot by any contract with each other alter their legal relations, except as to property[.]" Could Pamela waive alimony claims in the future, thus allowing Terry free reign to engage in the above conduct towards his wife with no accountability? What about our public policy as set forth in SDCL 25–2–1? "Husband and wife *contract* toward each other obligations of mutual respect, fidelity and support." (Emphasis added.) More recently, our legislature has shown its justifiable contempt for such spousal misconduct by enacting SDCL ch 25–10, which prohibits "domestic abuse" and provides "protection orders" against such activities. SDCL 25–10–1(1) defines domestic abuse to include "infliction of fear of imminent physical harm or bodily injury." The trial court's finding that "Terry told Pamela that he had one shell for his gun and it was meant for her" and that these comments were serious enough that they "made Pamela fearful, caused her to move out of the marital home and file for divorce" certainly fall within the definition of domestic abuse.[6]

[¶ 37.] In *Bayer v. Burke*, we granted summary judgment in favor of the defendant being sued for a gambling debt. 338 N.W.2d 293 (S.D.1983). In doing so we brushed aside the argument that this was only a suit on a note and went to the real nature of the dispute, "[a]s this court has stated, gambling contracts often try to take the form of legitimate contracts. It is the duty of the courts to pierce this disguise and to ascertain the real activities involved." *Id.* at 294 (citing *Waite v. Frank*, 14 S.D. 626, 86 N.W. 645 (1901)).[7]

[¶ 38.] Most recently in *Himrich* we squarely addressed the same issue we should

address today, whether the intentional violation of a statute by a client should place the monetary loss on that client or should the client's lawyer be liable under a malpractice theory. Like the case now before us, the client's liability had been previously decided by a decision of this Court. *See Speckels v. Baldwin*, 512 N.W.2d 171 (S.D.1994). In the subsequent malpractice action, we rejected the claim against the attorney as it was the client, and not the attorney, who had violated the public policy as set forth in the statute. We held, "[e]quity and natural justice invalidate contracts which, by their nature, threatened to 'weaken public confidence in the integrity of the public service.'" *Himrich*, 1997 SD 116 ¶ 14, 569 N.W.2d at 572 (citations omitted). The same public policy considerations must surely apply to the public policy of promoting the institution of marriage and its corresponding benefits to the participants, their family, and society in general.

[¶ 39.] Clearly, attorneys are not insurers to their clients for any losses the client may sustain based on wrongful intentional acts by the client. Given that, our analysis in *State Farm Mut. Auto. Ins. Co. v. Wertz*, 540 N.W.2d 636, 640 (S.D.1995), is appropriate to the issue now before us:

Having now determined that Wertz intentionally caused personal injuries to Martin and property damage to Anderson, we must now consider whether such conduct falls within the coverage provided by State Farm. We conclude that there is no coverage in such circumstances, because public policy prohibits extending insurance coverage to an individual who intentionally harms others. In *Raphtis v. St. Paul Fire & Marine Co.*, 86 SD 491, 494, 198 N.W.2d 505, 507 (1972) we wrote: "It is contra bonos mores to allow a man to insure against the consequences of his own rascality or recover for a loss resulting from his own criminal conduct." We have similarly observed: "Were a person able to insure

---

**6.** At trial, Pamela also testified that Terry physically assaulted her although it occurred before the couple were married. Terry did not deny the allegation of this physical abuse.

**7.** In accord is SDCL 53–9–1 which states, "[a] contract provision contrary to an express provision of law or to the policy of express law, though not expressly prohibited or otherwise contrary to good morals, is unlawful."

himself against economic consequences of his intentional wrongdoing the deterrence attributable to financial responsibility would be missing." *City of Fort Pierre,* 463 N.W.2d at 849.[8] We will not allow Wertz to contravene this well-established public policy and inflict deliberate harm with financial impunity.

[¶ 40.] The authorities from other jurisdictions are in accord and will dismiss claims by clients against their attorneys where the client had been guilty of intentional misconduct. Mallen & Smith, *Legal Malpractice* 4th Ed § 20.4. Anyone should know the conduct of emotional abuse engaged upon by Terry was wrong. In reviewing the obviously blatant misconduct of a client, the court in *Pantely v. Garris, Garris & Garris, P.C.,* 180 Mich.App. 768, 447 N.W.2d 864 (1989) reasoned:

> [P]erjury in not complex; to tell the truth poses no dilemma. Even against the backdrop of a moral relativism that passes for intellectual sophistication in contemporary America perjury is wrong.... A law degree does not add to one's awareness that perjury is immoral and illegal, any more than an accounting degree adds to one's awareness that tax fraud is immoral and illegal.

The Supreme Court of Wisconsin, in dismissing an attorney malpractice case for client misconduct, justified its holding on the following public policy rationale:

> Although the public interest is served by discouraging attorney misconduct, it would be inappropriate to promote that interest by removing the damage to those who deliberately and willfully lie under oath in bankruptcy proceedings. A court should not encourage others to commit illegal acts upon their lawyer's advice by allowing the perpetrators to believe that a suit against the attorney will allow them to obtain relief from any damage they might suffer if caught. The attorney's misconduct of advising clients to perform illegal acts should be discouraged by threat of attorney disciplinary action.

[¶ 41.] *Evans v. Cameron,* 121 Wis.2d 421, 360 N.W.2d 25, 29 (1985). *See also General Car & Truck Leasing System, Inc. v. Lane and Waterman,* 557 N.W.2d 274 (Iowa 1996). "There is not the slightest unfairness in holding plaintiff responsible for the bitter fruit of the scheme which he masterminded and in which he and his attorney jointly participated." *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1121 (1st Cir.1989).

[¶ 42.] Even more telling in this case is that there is nothing in the record to indicate that Theeler was aware of Terry's intended marital misconduct at the time the agreement was drafted or prior to the commencement of the divorce. Terry does not even attempt to argue to the contrary. Thus, what public policy justification can there be for requiring Theeler to pay damages in this case? *See Mettes v. Quinn,* 89 Ill.App.3d 77, 44 Ill.Dec. 427, 411 N.E.2d 549 (1980) (dismissing malpractice action against negligent attorney where that negligent advice caused the plaintiff/client's fraud to be uncovered).

[¶ 43.] The real issue before us is who should pay the alimony which is based on fault, Terry who perpetrated the abuse upon Pamela or Theeler who failed to draft an agreement to allow Terry to perpetrate the abuse with impunity. Theeler did not cost Terry Greene $24,000 in alimony payments by drafting a void clause. Terry is bound by the divorce findings that it was his misconduct towards his wife that was the cause. Again, an "attorney is liable in a malpractice action only for losses actually sustained as a proximate result of the conduct of the attorney." *Staab,* 351 N.W.2d at 466. Under our holding in *Staab* and subsequent authority, *Greene v. Greene* is the law of the case and Terry cannot relitigate it.

[¶ 44.] As such I would affirm the trial court and doing so respectfully dissent on issue two.

---

8. A legislative expression of this public policy is also found in SDCL 53–9–3, which provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud or *willful injury to the person or property of another* or from violation of law whether willful or negligent, *are against the policy of the law.*" (Emphasis added.)