1999 SD 148

**ATWOOD–KELLOGG, INC.,**
**Plaintiff and Appellant,**

v.

**NICKESON FARMS; Jerry Nelson; Doug Medhaug; Jason Medhaug d/b/a Medhaug Farms; Clark Huggett; Roger Hill; Willard Hill; Hill Farms, Inc.; and Clayton Halverson, Defendants and Appellees.**

**No. 20902.**

Supreme Court of South Dakota.

Considered on Briefs Sept. 13, 1999.

Decided Nov. 23, 1999.

James M. Cremer of Bantz, Gosch, Cremer, Peterson & Sommers, Aberdeen, South Dakota, for plaintiff and appellant.

Danny R. Smeins, Britton, South Dakota, for defendants and appellees.

AMUNDSON, J.

[¶ 1.] Atwood–Kellogg, Inc., appeals the granting of summary judgment in favor of the defendant farmers (Farmers). We reverse and remand for trial.

1. Medhaug Farms, Inc., delivered corn to FEC until November 10, 1995, Hill Grain Farms, Inc., delivered corn until October 31, 1995, and Roger Hill delivered corn up until November 2, 1995.

2. The letter from John Case stated:
   Dear Myron:

## FACTS

[¶ 2.] In 1995 Farmers each contracted to sell corn and soybeans to Farmers Elevator Company of Eden, South Dakota (FEC). The contracts provided that delivery of the commodities was to be made by December 1, 1995. Atwood–Kellogg provided financing to FEC and retained a security interest in FEC's accounts receivables and contract rights.

[¶ 3.] After entering into the contracts, FEC began to suffer serious financial problems and became insolvent. The issue of FEC's insolvency was undisputed by the parties. It was also undisputed that several of the farmers made deliveries after FEC became insolvent.[1] Farmers conceded the fact that not all of the commodities were delivered under the contract, but several farmers do dispute the quantity of commodities that Atwood–Kellogg alleged remained undelivered under the contract.

[¶ 4.] On November 6, 1995, FEC held an annual stockholders meeting. Present at the meeting were FEC's customers, a South Dakota Public Utilities Commission staff member, FEC's Board of Directors, and Farmers. Jim Kolle, a representative of Atwood–Kellogg, announced at the meeting that Atwood–Kellogg would guarantee payment of the grain contracts in writing. The guarantee was retracted on November 20, 1995, when Mr. Kolle told FEC's Board of Directors that Atwood–Kellogg would not provide written guarantees of payment.

[¶ 5.] Next, John Case, President of Atwood–Kellogg, mailed a letter to Myron Steiner, President of FEC, on November 29, 1995, proposing to guarantee payment on the Farmers' contracts.[2] Steiner

There's been some discussion about whether or not your patrons will be paid if they delivered corn on contracts after November 30, 1995. *To my knowledge, all patrons delivering on contracts in November have been paid. Atwood–Kellogg will guarantee that patrons delivering corn on contracts after November 30, 1995 will also be paid."*

claimed in his affidavit that he informed all farmers with outstanding contracts of the Case letter guaranteeing payment. Willard Hill, one of the Farmers and a member of FEC's Board of Directors, claimed that he did receive a copy of this letter, but it did not specifically mention what contract. The remaining Farmers claim they never had knowledge of the existence of the letter until they were advised of its existence by their attorney on August 24, 1998.

[¶ 6.] Farmers refused to deliver their commodities pursuant to the contract due to FEC's insolvency. Farmers suspended delivery under SDCL 57A-2-609 and 2-702, since there was no adequate assurance of payment. As a result of Farmers nondelivery, Atwood–Kellogg claims to have suffered damages.

[¶ 7.] Atwood–Kellogg commenced this action against Farmers for breach of contract by Farmers for failure to deliver under the contract.[3] Prior to trial, both parties moved for summary judgment. The trial court granted summary judgment for Farmers, but denied Atwood–Kellogg's motion. Atwood–Kellogg appeals, raising the following issue:

Are the Defendant Farmers relieved from their obligation to deliver corn and soybeans to the insolvent buyer, Farmers Elevator of Eden, when the Plaintiff, the Elevator's financier, offered to pay for the corn and soybeans?

## STANDARD OF REVIEW

[¶ 8.] Our standard of review on a motion for summary judgment is well established. A "[s]ummary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions, together with any affidavits, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *City of Lennox v. Mitek Indus., Inc.*, 519 N.W.2d 330, 332 (S.D.1994) (citing *Breen v. Dakota Gear & Joint Co., Inc.*, 433 N.W.2d 221, 223 (S.D.1988)). Further, this court has held that:

"We will affirm only when there are no genuine issues of material fact and the legal questions have been correctly decided. All reasonable inferences drawn from the facts must be viewed in favor of the nonmoving party. The burden is on the moving party to clearly show an absence of any genuine issue of material fact and an entitlement to judgment as a matter of law. On the other hand, '[t]he party opposing a motion for summary judgment must be diligent in resisting the motion, and mere general allegations and denials which do not set forth specific facts will not prevent issuance of a judgment.'"

*Zuke v. Presentation Sisters, Inc.*, 1999 SD 31, ¶ 14, 589 N.W.2d 925, 928 (quoting *Greene v. Morgan, Theeler, Cogley & Petersen*, 1998 SD 16, ¶ 6, 575 N.W.2d 457, 459) (citations omitted). If any basis exists "which supports the ruling of the trial court, affirmance of a summary judgment is proper." *Id.* (citing *Mack v. Kranz*

---

Because of transportation difficulties these contracts have been extended and we anticipate the last train will be placed sometime around the middle of December. This gives those patrons a window of two or three weeks to make delivery of their corn and we will guarantee that they will get paid. This applies to only contracts that are already in existence and it is my understanding that it applies chiefly to corn contracts which total nearly 200,000 bushels. These are contractual obligations between your patrons and the elevator, and we will make this guarantee so that those patrons can be comfortable that the elevator will perform its obligations to receive and pay for their grain.

Sincerely,
Atwood–Kellogg Company
John P. Case
President

(Emphasis added.)

3. On February 22, 1996, FEC filed Chapter 11 bankruptcy and subsequently converted it to a Chapter 7 bankruptcy on October 16, 1996. Atwood–Kellogg requested and was granted relief from the bankruptcy stay with respect to FEC's contract rights.

*Farms, Inc.,* 1996 SD 63, ¶ 8, 548 N.W.2d 812, 814).

## DECISION

■ [¶ 9.] In contracts for the sale of goods, a general precept exists which states that the seller must make timely delivery and transfer goods to the buyer, while the buyer has a duty to accept the goods and pay the seller. *See* SDCL 57–4–1. *See also Erwin Weller Co. v. Talon Inc.,* 295 N.W.2d 172, 174 (S.D.1980) (citing SDCL 57–4–1). It is undisputed that Farmers failed to deliver to buyer all commodities under the contract.

■ [¶ 10.] Nondelivery by a seller of goods can be justified under certain situations. One such circumstance is if a seller of goods discovers that a buyer has become insolvent, the UCC allows the seller to "refuse delivery except for cash." *See* SDCL 57A–2–702.[4] *See, e.g., Kunian v. Development Corp. of America,* 165 Conn. 300, 334 A.2d 427, 433 (1973) (noting that the plaintiff "informed the defendant that it would deliver the balance of the material only if payment of the entire contract was guaranteed by the defendant's depositing sufficient cash in escrow to pay for the delivered materials."). Farmers contend that under SDCL 57A–2–702, they were "entitled to refuse delivery under the contracts except for cash" because FEC was insolvent. However, Atwood–Kellogg argues that Farmers never made a demand for cash; therefore, they cannot rely on 57A–2–702. The statute, which states that when a seller "discovers" buyer's insolvency *"he may refuse delivery except for cash,"* clearly and unambiguously places the obligation on the seller (Farmers) to condition a refusal to deliver on the payment of cash.

■ [¶ 11.] Farmers also argue they are entitled to adequate assurances of performance under SDCL 57A–2–609(1) which provides:

(1) A contract for sale imposes an obligation of each party that the other's expectation of receiving due performance will not be impaired. *When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurances of due performance and until he receives such assurance may if commercially reasonable suspend any performance* for which he has not already received the agreed return.

SDCL 57A–2–609 (1997) (emphasis added). Under this section, Farmers with knowledge of insecurity may seek adequate assurances from FEC. The purpose of this section is to "obviate the necessity of one party guessing whether or not the other intends to perform when he begins to receive signals that cause him concern." *Cole v. Melvin,* 441 F.Supp. 193, 203 (D.S.D.1977) (citing J. White & R. Summers, Uniform Commercial Code § 6.2 (1st Ed1972)).

[¶ 12.] Atwood–Kellogg argues that under SDCL 57A–2–609, a written demand for adequate assurances is required. Decisions involving written demands for assurances vary. In *Johnson v. Land O' Lakes,* 181 F.R.D. 388, 394 (N.D.Iowa 1998), the district court faced a statute, Iowa Code § 554.2609(1), which is analogous to SDCL 57A–2–609(1). The statute provided that " '[w]hen reasonable grounds for insecurity arise with respect to the performance of either party the other *may in writing demand* adequate assurance of due performance.' " *Id.* (emphasis added). The court noted that " '[t]his section requires the demand for assurances be in writing.' " *Id.* (quoting *SPS Indus., Inc. v. Atlantic Steel Co.,* 186 Ga.App. 94, 366 S.E.2d 410, 413–14 (1988)). The court added *"absent attenuating circumstances,* this written demand is required before the

---

4. SDCL 57A–2–702(1) states:

(1) Where the seller discovers the buyer to be insolvent he may refuse delivery except for cash. . . .

demanding party may proceed with remedies for anticipatory breach[.]" *Id.* (emphasis added).

[¶ 13.] In *SPS Industries,* the court was interpreting OCGA § 11–2–609(1), which is identical to SDCL 57A–2–609(1). 366 S.E.2d at 413. The statute provided that "[w]hen reasonable grounds for insecurity arise with respect to the performance of either party the other *may in writing demand adequate assurance* of due performance[.]" *Id.* (citing OCGA § 11–2–609(1)) (emphasis added). The court emphasized that section 11–2–609(1) " 'clearly requires that when reasonable grounds for insecurity arise, before a party avails himself of the right to suspend his further performance, he must, *in writing demand adequate assurance of due performance* of the other party.' " *Id.* (quoting *Automated Energy Systems v. Fibers & Fabrics of Ga.,* 164 Ga.App. 772, 774, 298 S.E.2d 328, 329) (emphasis in original). *See also Continental Grain Co. v. McFarland,* 29 UCCRep 512, 628 F.2d 1348 (4th Cir.1980) (denying justification for sellers repudiation in the contract for lack of assurances provided by the buyer because the statutorily required written demand was not made). The statutes of Iowa and Georgia both utilize the same phraseology of "may demand" as South Dakota's statutes. *Compare* Iowa Code § 554.2609(1), OCGA § 11–2–609(1), *and* SDCL 57A–2–609(1).

[¶ 14.] Other jurisdictions addressing this issue have held that a written demand for adequate assurances is not necessary. *See AMF, Inc. v. McDonald's Corp.,* 536 F.2d 1167, 1170–71 (7th Cir.1976). In *AMF,* the court rejected a "formalistic approach" to the "written demand" requirement. *Id.* The basis for the court's determination was that both parties had a "clear understanding" that McDonald's had suspended performance until it should receive adequate assurance of due performance from AMF. *Id.* at 1171.

[¶ 15.] Contrary to the express UCC requirement of "in writing," some courts have upheld an oral demand for adequate assurances. 67 AmJur2d *Sales* § 515 (citing *Kunian,* 334 A.2d at 433). *See also Magnet Resources, Inc. v. Summit MRI, Inc.,* 318 N.J.Super. 275, 723 A.2d 976, 983–84 (N.J.Super.Ct.App.Div.1998) (citing *Kunian* as factually analogous). In *Kunian,* the court held that plaintiff's oral demand of adequate assurances by the defendant, to pay the outstanding indebtedness before plaintiff would continue delivery, "was equivalent to a written demand for adequate assurances." 334 A.2d at 433. We find that more convincing authority exists that a written demand for adequate assurances is not necessary; a demand for adequate assurances may be either written or oral, as long as the demand provides a "clear understanding" of the insecure party's intent to suspend performance until receipt of adequate assurances from the other party. *See AMF,* 536 F.2d at 1171.

[¶ 16.] In reviewing the record, Farmers, in support of their motion for summary judgment, allege that they made both written and oral demands upon Atwood–Kellogg for assurances; the assurances sought were guarantees of payment. In the affidavit of Willard Hill, a stockholder, patron, and Board of Director member of FEC, he noted that "[t]he Board of Directors of the Elevator received written notice and oral notice from grain contract holders or their representatives concerning the problems associated with delivery of grain to the Elevator without a written guarantee from Atwood–Kellogg, Inc." It is obvious that there were "attenuating circumstances" involved in this case as reflected hereinbefore. Whether there was a demand for assurances or a mere request for information is disputed. Also, it is disputed whether Farmers provided Atwood–Kellogg with a clear understanding that they intended to suspend performance until receipt of adequate assurances. Another issue in dispute is whether a fact-finder would find that delivery was to be made only upon payment of cash.

[¶ 17.] Based upon this scanty record, whether or not the requirements of SDCL 57A–2–609(1) and 2–702 were complied with is disputed. Therefore, the trial court erred in granting summary judgment for Farmers. We also find that the trial court did not err in denying Atwood–Kellogg's motion for summary judgment.

[¶ 18.] We reverse and remand for trial.

[¶ 19.] MILLER, Chief Justice,
SABERS and KONENKAMP, Justices, concur.

[¶ 20.] GILBERTSON, Justice, dissents.

GILBERTSON, Justice (dissenting).

[¶ 21.] I would affirm the summary judgment granted by the trial court and as such, I respectfully dissent.

[¶ 22.] The material facts to this case are not in dispute. The elevator which had contracted for delivery of the grain was insolvent. On November 6, 1995, Atwood orally stated it would subsequently guarantee payment in writing on behalf of the elevator on November 20, 1995. Atwood, without notice, orally revoked its promised guarantee. Ten days later, on November 30, 1995, Atwood drafted a letter sent to the Chairman of the Board of the elevator stating it would "guarantee" payment. All but one of the farmers never got a copy of this letter. The farmers never delivered the full amount of the grain contracted for delivery.

[¶ 23.] *The specific relief sought by Atwood.*

[¶ 24.] Procedurally, in the circuit court both Atwood and the farmers filed cross-motions for summary judgment. As such, Atwood argued to the circuit court backed up by its affidavits and legal arguments, there was no question of fact as to the farmers' liability for breach of contract. The farmers agreed summary judgment was appropriate, but differed with Atwood as to which party was entitled to judgment as a matter of law. On appeal to this Court, Atwood framed as its sole issue:

Are the defendant farmers relieved from their obligation to deliver corn and soybeans to the insolvent buyer, Farmers Elevator of Eden, when the plaintiff, the elevator's financer, offered to pay for the corn and soybeans?

Now, the Majority would give Atwood something it did not even seek once it filed its summary judgment motion in the circuit court and subsequently in its appellate brief: a trial to determine questions of fact. Atwood's request for relief in its brief states, "[t]he trial court's order granting the defendant farmers summary judgment should be reversed with directions to enter judgment for plaintiff, Atwood–Kellogg in the sum of $128,952.72." After letting the farmers counter this argument in their reply brief, Atwood apparently sensing it would not prevail on its demand for outright judgment, now for the first time discovered that a question of fact really might exist after all and it was entitled to either outright judgment on its behalf or if not, a trial on the merits.

A party to an action may not make a voluntary decision concerning a trial tactic and then when they find themselves in an undesirable position as a result of that legal posture, attempt to proceed in a subsequent inconsistent manner. Judicial estoppel bars such gamesmanship.

*Gregory v. Solem,* 449 N.W.2d 827, 832 n. 8 (S.D.1989) (citing *Federal Land Bank of Omaha v. Johnson,* 446 N.W.2d 446 (S.D. 1989)). *See also Estes v. Millea,* 464 N.W.2d 616, 619 n. 3 (S.D.1990).

[¶ 25.] *Notice to Atwood of farmer's refusal to deliver grain.*

[¶ 26.] The Majority errs when it concludes there exists a question of fact as to whether under SDCL 57A–2–702 and 57A–2–609(1) the farmers provided Atwood with sufficient notice, either written or otherwise, that they would withhold delivery of their crops unless payment was made in

"cash." [5]  Atwood admitted it was fully aware the farmers were suspending performance until receipt of assurances. John Case, President of Atwood stated in an affidavit:

> Despite the lack of a written demand of adequate assurance of due performance from the defendants, on behalf of Atwood–Kellogg company, I provided such assurances pursuant to my November 29, 1995, letter to Myron Steiner, President of Farmers Elevator Company.

[¶ 27.] That letter further makes it clear Atwood was well aware of the farmers' demands for further deliveries given the insolvent status of the elevator:

> There's been some discussion about whether or not your patrons will be paid if they delivered corn on contracts after November 30, 1995.  To my knowledge, all patrons delivering on contracts in November have been paid.  Atwood–Kellogg will guarantee [6] that patrons delivering corn on contracts after November 30, 1995 will also be paid.

Thus, as in *AMF, Inc. v. McDonald's Corp.*, 536 F.2d 1167, 1170–71 (7th Cir. 1976), there is sufficient compliance with SDCL 57A–2–609 in that all parties had a clear understanding the farmers had suspended performance until they received adequate assurances of due performance from Atwood.

[¶ 28.] *Did Atwood offer to pay for the grain in "cash?"*

[¶ 29.] As to the merits of the dispute, I agree with the majority that SDCL 57A–2–702 is the controlling statute.  It states in part where the buyer is insolvent, the seller may "refuse delivery except for *cash* including payment for all goods theretofore delivered under the contract, and stop delivery under this chapter (57A–2–705)." (emphasis added).  Thus the question is whether the document authored by Atwood can somehow be considered "cash." [7]

[¶ 30.] Our code does not define what constitutes "cash."  However SDCL 23A–43–3(5) makes it clear that "cash" is different than a bail bond which is in effect a guarantee for a criminal defendant's appearance.  Compare with the language of the Atwood letter that states in part, "Atwood–Kellogg will *guarantee* that patrons delivering corn on contracts after November 30, 1995 will also be paid." (emphasis added).

[¶ 31.] Instructive is our decision in *Dale v. Pelton*, 365 N.W.2d 1 (S.D.1985). Therein Dale entered into a document en-

---

**5.** SDCL 57A–2–609(1) states in part where reasonable grounds arise in the seller as to the solvency of the buyer, the seller *"may* in writing demand adequate assurance of due performance . . ."  As we recently held in *State v. Burgers*, 1999 SD 140, ¶ 15, 602 N.W.2d 277 "[w]ith respect to legislative enactments, we have held that the word 'may' in a statute should be construed in a permissive sense unless the context and subject matter indicate a different legislative intent." (citing *Person v. Peterson*, 296 N.W.2d 537, 538 (S.D.1980)).

**6.** Even as a purported guarantee this document fails against all farmers except Willard Hill. SDCL 56–1–4 explicitly states, "a guaranty must be in writing . . ." Only Hill received a copy of the letter.  Despite the fact SDCL 56–1–4 was raised as a defense by the farmers, Atwood makes no attempt to argue its guarantee falls into one of the exceptions to a writing contained in SDCL 56–1–6 through 56–1–9.  Furthermore, this "guarantee" by its terms, limits itself to corn and thus did not "guarantee" contracts for the delivery of soybeans entered into by the farmers.

**7.** This issue is relegated to one sentence in Atwood's eight page brief: "instead, since they [farmers] were guaranteed payment, they were, in effect, offered 'cash' and were obligated to deliver, and they would have received what they contracted for."  This statement is made without any supporting authority whatsoever and therefore under our appellate rules, the entire argument should be deemed abandoned.  Failure to cite supporting authority is a violation of SDCL 15–26A–60(6) and should result in the issue being waived.  *State v. Pellegrino*, 1998 SD 39, ¶ 22, 577 N.W.2d 590, 599.

titled a "Cash Farm and Ranch Lease" for the "annual cash rent" of $8,000. When Dale ran into financial trouble he tried to substitute a promissory note for the "cash" payment. In upholding summary judgment against Dale we held his attempt to substitute a promise to pay in the form of a note was not a "legally sufficient compliance with the terms of the lease" which demanded payment to be made in cash. *Dale*, 365 N.W.2d at 3. In so doing we reasoned:

> "cash" in its strict sense refers to coins and paper money. It is also used, less strictly, to mean not only money but also checks and demand deposits in banks and savings institutions. *Stewart v. Selder*, 473 S.W.2d 3, 8 (Tex.1971). *A promissory note, even if fully secured, does not constitute cash or its equivalent.* *Don E. Williams Co. v. Comm'r of Internal Revenue*, 429 U.S. 569, 97 S.Ct. 850, 51 L.Ed.2d 48 (1977); *Battelstein v. Internal Revenue Service*, 611 F.2d 1033 (5th Cir.1980). Dale's February 7, 1983 promise to pay was nothing more than a promissory note secured by collateral. In no reasonable meaning of that word could it be considered the equivalent of cash.

*Id.* (emphasis added). Atwood's letter is even more deficient than Dale's as it merely promises to pay but is secured by no collateral.

[¶ 32.] Cash is "money or currency issued by lawful authority intended to pass and circulate as such." *Lee v. State Department of Public Health*, 480 S.W.2d 305, 309 (Mo.App.1972) (other citations omitted). "The word cash ... means ready money and does not include a promise to pay in the future ..." *Sun Finance*

*& Loan Co. v. H.M. Ferguson, Inc.*, 162 N.E.2d 880, 881 (Ohio Ct.App.1959) (per curiam). Art 1 § 8 of the United States Constitution reserves unto the Federal Government the exclusive power to "coin money, regulate the value thereof ..." Pursuant to that authority Congress passed PL 89-81, § 102 which states:

> All coins and currencies of the United States (including Federal Reserve notes and circulating notes of Federal Reserve banks and national banking associations), regardless of when coined or issued, shall be legal tender for all debts, public and private, public charges, taxes,[8] duties, and dues.

[¶ 33.] A more expansive view of the definition of cash is taken by other courts. However, even under this expanded definition the term "cash" still excludes checks, drafts and negotiable instruments in any other form. It means United States currency. Certified checks, bank drafts and cashier's checks may, in appropriate circumstances, constitute an exception when drawn upon or issued by banks the existence and solvency of which are known to the person accepting them. *Buckeye Development Corp. v. Brown & Shilling, Inc.*, 243 Md. 224, 220 A.2d 922, 925 (1966).

[¶ 34.] Whether one adopts a strict definition of cash to be synonymous with "legal tender" or includes other bank guaranteed forms of payment, under either definition, the document drafted by Atwood is not "cash." It is no more than a unilateral promise to pay which is based solely on its financial viability and the on-again, off-again and on-again self-declared willingness of Atwood to honor its promise to pay.

[¶ 35.] *Dale* supports summary judgment in favor of the farmers as there we held "this is the type of case that is apt for

---

**8.** Perhaps no clearer example of the fact this Atwood document does not equate with cash comes from what would happen if the farmers attached it to their income tax returns as payment and sent them into the Internal Revenue Service for processing.

disposition by motion for summary judgment, involving as it does only questions regarding the adequacy of payment under a written instrument." 365 N.W.2d at 3. Here, since Atwood's unsecured promise to pay is not "cash," it does not meet the legal requirements of SDCL 57A–2–702 to demand delivery from the farmers.

[¶ 36.] For the above reasons I would affirm the summary judgment of the trial court and therefore respectfully dissent.